STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

NARRAGANSETT PELLET CORP.

VS.

PC 06-5409

CITY OF EAST PROVIDENCE, through its Treasurer, KEVIN FITZGERALD; ALBERT QUATTRUCCI, individually and in his capacity as Building Official of the City of East Providence; JOSEPH J. KLUCZNIK, individually and in his capacity as Fire Chief of the City of East Providence, and DAVID RAVE, individually and in his capacities as Fire Captain and Deputy State Fire Marshal; GEORGE S. FARRELL, in his Capacity as State Fire Marshal; and RENE R. COUTU, W. KEITH BURLINGAME, MARK J. BLACKBURN, MARION C. FILIPPI, DANA NEWBROOK, RICHARD O'CONNELL, STEWART D. PEARSON, GORDON PREISS, and HENRY RICHARD, JR., in their capacities as members of the FIRE SAFETY CODE BOARD OF APPEAL AND REVIEW; and THOMAS B. COFFEY, Jr., in his capacity as Executive Director of the Fire Safety Code Board of Appeal and Review

## VERIFIED AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND FOR MONETARY DAMAGES

## GENERAL ALLEGATIONS

1. Plaintiff, Narragansett Pellet Corp. (hereinafter, "Narragansett,") is a business corporation duly organized under the laws of the State of Rhode Island, with its principal place of business located at 275 Ferris Avenue, East Providence, Rhode Island.

2. Narragansett is a new business concern, first incorporated in January, 2006.

True Copy Attest
[signature]
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence Rhode Island

3. Narragansett was organized for the purpose of manufacturing wood pellets. These wood pellets are manufactured from clean waste wood that would otherwise have been put in landfills, and are used in so-called "pellet stoves" for home heating purposes as an alternative to other energy sources, such as oil.

4. Several months prior to Narragansett's incorporation early this year, the current President of Narragansett and one of its original incorporators, William Carden, first contemplated entering into a lease for the premises located at 275 Ferris Avenue, East Providence, for the purposes of providing a base for Narragansett's business and manufacturing operations.

5. The 275 Ferris Avenue, East Providence premises were uniquely well-suited for the operations contemplated by Narragansett due to the fact that the premises already had silos for storage, ample power supplies and space, loading docks, and railway platform that was essential to operate its business.

6. During the month of December, 2005, as part of his investigation into the suitability of the premises located at 275 Ferris Avenue, William Carden met with the East Providence Fire Department's former Fire Marshal, Captain Curtis R. Wise, regarding the steps that would be necessary to bring the 275 Ferris Avenue premises in line with applicable fire and life safety codes.

7. Captain Wise advised Mr. Carden to obtain the services of an architect in order to assist in complying with the applicable fire and life safety codes.

8. At this time, Captain Wise identified NFPA 664 as the applicable fire code for the proposed business operations of the Plaintiff.

9. On or about January 30, 2006, Narragansett was incorporated by Mr. Carden.

10. On or about January 31, 2006, the day after Narragansett became incorporated, Narragansett officials met with East Providence's Zoning Officer, Edward Pimental, and Jeanne M. Boyle, East Providence's Planning Director.

11. During that meeting, Narragansett discussed with Pimental and Boyle its plans to operate a wood pellet manufacturing business.

12. Said discussion included a description of the manufacturing process.

13. Narragansett officials followed up the January 31, 2006 meeting with a written communication dated February 2, 2006 describing Narragansett's plans and manufacturing processes. (See Exhibit A.)

14. On or about February 10, 2006, Narragansett received zoning/planning approval.

15. During the months of February, March, and April, Narragansett obtained financing from Sovereign Bank and the Small Business Administration. Additionally, Narragansett also obtained financing from the East Providence Economic Development Commission of approximately $99,000. Narragansett also obtained financing through the Rhode Island Economic Development Corporation in the amount of $125,000.

16. On or about April 10, 2006, Narragansett Pellet Corp. entered into a ten-year lease for the premises at 275 Ferris Avenue, East Providence. The purpose of this lease was to provide a base for Narragansett's business and manufacturing operations.

17. Narragansett also applied for appropriate building permits, and submitted all required plans. Such plans were prepared by Ai Designs, headed by well known architect Dana Newbrook. Mr. Newbrook is well acquainted with fire code requirements. He is a member of the Rhode Island Fire Safety Code Board of Appeal and Review.

18. On or about May 8, 2006, Narragansett officials met with Fire Marshal Captain Wise and City Fire Alarm Inspector Robert Powers, as well as the firm that would be responsible for installing Narragansett's fire alarm and sprinkler systems, and further discussed their proposed manufacturing operations. This communication was followed up by an e-mail from Mr. Carden further describing the operations.

19. On or about May 23, 2006, the City of East Providence, through its Building Official, Albert Quattrucci, issued Building Permit A31628 approving Narragansett's construction plans for the 275 Ferris Avenue premises. (See Exhibit B, attached.) A set of plans detailing the work to be performed was stamped: "Approved for Construction."

20. Upon issuance of Building Permit A31628, Narragansett commenced construction at the 275 Ferris Avenue premises in accordance with the Permit.

21. During the months of July and August, 2006, Narragansett entered into arrangements for raw materials and the railway cars required to ship said raw materials. Narragansett also entered into sales contracts for the finished wood pellets.

22. Narragansett had anticipated beginning the manufacturing process in August-September, 2006.

23. During July, 2006, Narragansett requested a Certificate of Occupancy from the Building Official.

24. At the time that Narragansett requested a Certificate of Occupancy, Narragansett had substantially completed the construction necessary to comply with the Fire Code and Life Safety Codes under the plans approved with the issuance of Building Permit A31628.

25. East Providence's current Fire Marshal, Captain David Rave, had taken office on or about July 24, 2006. Captain Rave also serves as a Deputy State Fire Marshal.

26. Beginning with his first meeting with Narragansett on or about August 1, 2006, Captain Rave has taken the position that the Building Permit A31628 had not been validly approved because the former Fire Marshal did not approve and/or sign the building permit.

27. On or about August 8, 2006, Captain Rave met with Narragansett officials and presented them with a list of areas in which he found that, in his opinion, the plans submitted did not conform to the Rhode Island Uniform Fire Code and Rhode Island Life Safety Code. (See Exhibit C, attached.)

28. Most notably, Captain Rave sought to change Narragansett's hazard classification. Captain Rave took the position that the use of this material constituted "wood dust," as defined by the Code; and would therefore place the entire 275 Ferris Avenue premises in the High Hazard Industrial class.

29. Narragansett's new classification as High Hazard Industrial, as demanded by Captain Rave, would require hundreds of thousands of dollars in additional construction work that had not been anticipated when Narragansett originally planned its budget for construction needed for the 275 Ferris Avenue property. The new classification and resultant additional construction work threatened to cause substantial delays in beginning operations.

30. During the August 8, 2006 meeting, Captain Rave and Narragansett officials discussed submissions of new plans, machinery layouts, and data and specifications that Captain Rave would require.

31. On the afternoon of August 8, 2006, William Carden spoke with Captain Rave by telephone. Mr. Carden indicated that, as an accommodation to Captain Rave, he would be changing his specifications for raw material so as to obviate the need for wood dust. Captain Rave indicated that if Mr. Carden did that, he would have his Temporary Certificate of

Occupancy issued the next week. However, Captain Rave indicated that he would be having a third-party review performed to be sure that life/safety issues were being handled and that the operation was in compliance.

32. Mr. Carden in fact changed his specifications for raw material so that he would no longer be using sawdust in his manufacturing process.

33. On or about August 16, 2006, Narragansett submitted an application for a new building permit, as well as a Plan Review Application.

34. Narragansett submitted these materials in response to Captain Rave's instructions. Captain Rave had indicated that this new permit was necessary due to the egress changes demanded in his list of deficiencies dated August 7, 2006.

35. On or about August 23, 2006, Hughes Associates, Inc., the third-party reviewer selected by Captain Rave, issued its report.

36. On or about September 6, 2006, Captain Rave issued a new deficiency list to Narragansett. (See Exhibit D, attached.) This document substantially added to the original list of deficiencies, requiring the remediation of numerous items that had not been identified in the earlier list. This document also continues to classify Narragansett as High Hazard.

37. On or about September 8, 2006, Captain Rave contacted Donna Carden-Harker, Narragansett's Office Manager, and advised her that he was rejecting the plans submitted in connection with the August 16, 2006 building permit application, and demanded that she pick them up. No information was provided as to the basis of this rejection.

38. By September 11, 2006, Narragansett had the necessary machinery in place to being operations, and had also received the delivery of raw materials.

39. On September 11, 2006, Narragansett officials also met once again with Captain Rave and other City officials regarding compliance with Captain Rave's deficiency list.

40. On or about September 15, 2006, in accordance with Captain Rave's instructions, Narragansett submitted a plan for addressing the deficiency list of September 6, 2006. (See Exhibit E, attached.)

41. In said communication Narragansett agreed that area in the premises wherein the raw materials would be stored (hereinafter, "Area A,") would be deemed a High Hazard Area. Additionally, Narragansett agreed that a portion of the manufacturing area (hereinafter, "Area B") would also be deemed a High Hazard Area. That portion would encompass the grinder, which was the piece of machinery that would generate "wood dust," as defined by law.

42. Said communication also provided various items of information and product specifications demanded in the September 6, 2006 deficiency list.

43. On September 15, 2006, Narragansett officials also met with Captain Rave to discuss the plan set out in the September 15, 2006 correspondence. At that time, Captain Rave indicated that he would be willing to work with Narragansett on arrangements for an in-house cleaning to deal with issues of dust accumulations for a thirty-day trial period.

44. By September 21, 2006, Narragansett had received no communication in response to its submission of September 15, 2006. Accordingly, on or about September 21, 2006, William Carden e-mailed Captain Rave giving him further updates on their progress in addressing the deficiency list of September 6, 2006, and renewing the request for a Temporary Certificate of Occupancy. (See Exhibit F, attached.)

45. On or about September 27, 2006, Captain Rave wrote to Mr. Carden, giving him a list of items that he required for consideration of a Temporary Certificate of Occupancy. (See Exhibit G, attached.)

46. Said September 27, 2006 communication demanded that all of Area B be considered a High Hazard area before a Temporary Certificate of Occupancy would be issued.

47. Said September 27, 2006 communication also demanded further drawings and product specifications, as well as a timeline for completion of all deficiencies.

48. Captain Rave's September 27, 2006 communication also imposed further conditions upon the issuance of a Temporary Certificate of Occupancy. The September 27, 2006 also indicated that during any Temporary Certificate of Occupancy period, Narragansett would only be permitted to operate during the 1st and 2nd shifts, and would also be required to hire a detail fireman during said shifts. Captain Rave also rejected any possibility of an in-house cleaning system.

49. Captain Rave's September 27, 2006 communication made no reference to the documents submitted on or about September 15, 2006, responding to his deficiency list.

50. On or about September 29, 2006, Narragansett, through its counsel, responded to Captain Rave's September 27, 2006 communication. Said communication was copied to Building Official Quattrucci. (See Exhibit H, attached.)

51. Narragansett's September 29, 2006 communication responded to the list provided by Captain Rave in his September 27, 2006 communication, including the timeline for completion of deficiencies required in the September 27, 2006 communication. Narragansett agreed to consolidate the grinder into Area A.

52. The September 29, 2006 communication disagreed with the proposition that only 1st and 2nd shifts be permitted during the Temporary Certificate of Occupancy stage, as the construction could be done within existing operations without causing a hazard. Additionally, the September 29, 2006 communication disagreed with the proposition that a detail firefighter should be provided for. However, Narragansett proposed as alternatives that it 1) pay for one hour per day of detail firefighter time for random daily inspections; or 2) establish a connection between the Fire Department and Narragansett's closed circuit television system.

53. On or about October 4, 2006, Narragansett had completed a supplement to its September 29, 2006 correspondence further updating Captain Rave on the status of plan completion. (See Exhibit I, attached.)

54. When Donna Carden-Harker attempted to submit the October 4, 2006 correspondence, the Fire Chief refused to accept the documents because the appropriate person was not available. Also rejected at the same time was an updated egress plan prepared by Ai Designs that Captain Rave had demanded.

55. Unless this egress was approved, it would have been impossible to finish the remainder of these submissions.

56. On or about October 5, 2006, Ms. Carden-Harker returned to fire department headquarters and was successful in submitting the October 4, 2006 correspondence.

57. By letter headed October 4, 2006, Captain Rave wrote in response to the October 4, 2006 correspondence. (See Exhibit J, attached.)

58. In his October 4, 2006 letter, Captain Rave indicated that the issuance of a Temporary Certificate of Occupancy was beyond the scope of his authority, and indicated that the State Fire Marshal and/or the Fire Safety Code Board of Appeal and Review would be required to grant

such a Certificate. No state law was cited in support of this proposition. Captain Rave also indicated that before he would recommend issuance of a Temporary Certificate of Occupancy to the State Fire Marshal, he would require compliance with the list of items that he had provided in his letter of September 27, 2006. No reference was made to the authority of the city building inspector to issue a certificate of occupancy or a temporary certificate of occupancy.

59. Said correspondence also requested that further correspondence be conducted by certified mail.

60. On or about October 6, 2006, Narragansett had long since completed all of the work required under Building Permit A31628. Accordingly, Narragansett requested that Albert Quattrucci issue a Certificate of Occupancy. (See Exhibit K, attached.)

61. On or about October 10, 2006, Ms. Carden-Harker attempted to submit further updates to Captain Rave and Albert Quattrucci. (See Exhibit L, attached.) This submission was undertaken at the request of Assistant City Solicitor Timothy Chapman who, through counsel, advised Plaintiff that the fire department was contending that it had never seen the original building permit. He stated that he would provide a copy of the original permit to the fire department.

62. Even after receiving a copy of the original building permit, the Fire Department's secretary refused to accept this submission, stating that Plaintiff needed to submit an application for a new building permit along with the complete set of plans required with said applications.

63. Ms. Carden-Harker attempted to explain to Captain Rave that this submission was in response to his September 27, 2006 list rather than an application for a new building permit.

64. When Captain Rave insisted on an application for a new building permit and the complete set of plans required with said applications, Ms. Carden-Harker supplied a complete set

of plans. However, when she returned to Fire Department, she was told that she could not submit them because she did not have a new building permit application.

65. With the assistance of Building Official Quattrucci, Narragansett prepared and submitted a new application for a building permit, explaining that this permit only supplemented Building Permit A31628.

66. The Fire Department finally accepted Narragansett's submission, but has not responded.

67. Unless and until the Fire Department responds to Narragansett's present submission, it will be unable to proceed on plans for additional work demanded by Captain Rave.

68. On October 10, 2006, Captain Rave also refused to accept Ms. Carden-Harker's submission of fire alarm plans, asserting that they needed to be submitted by a licensed electrician.

69. Ms. Carden-Harker has attempted to file materials responsive to the demands of Captain Rave on seven (7) separate occasions.

70. On or about October 11, 2006 an architect from Ai Designs attempted to supply further updated plans to the fire department. Those plans were physically rejected as well.

71. Building Official Quattrucci has not responded to any of the requests for issuance for a Certificate of Occupancy.

72. However, on October 10, 2006, Building Official Quattrucci represented to Narragansett officials that the former Fire Marshal had verbally approved the plans submitted with the application for Building Permit A31628, and that such verbal approvals had been the longstanding practice.

73. No Certificate of Occupancy has been issued by the City of East Providence, and Narragansett therefore remains unable to begin operations.

74. On or about October 11, 2006, Building Official Quattrucci issued a Cease and Desist Order, forbidding Plaintiff to begin manufacturing operations until a Certificate of Occupancy is issued.

**COUNT I – INJUNCTIVE RELIEF**

75. Plaintiff realleges those allegations contained in the above Paragraphs as if fully restated therein.

76. The issuance of building permits is governed by R.I.G.L. § 23-27.3-114.1, which provides in pertinent part:

> (a) The building official shall examine or cause to be examined all applications for permits and amendments thereto within fifteen (15) days after filing. Before a permit is granted for the excavation or for the erection of any building or structure, a written statement shall be furnished by the owner from a town or city engineer as to the established grades. If the application or plans do not conform to the requirements of this code or of all applicable laws, the building official shall reject the application citing the specific sections of this code or applicable law upon which the rejection is based. If the building official is satisfied that the proposed work conforms to the requirements of this code and all laws applicable thereto, he or she shall issue a permit.

77. R.I.G.L. § 23-27.3-113.5 requires that with the application for a building permit, the applicant submit specifications and plans that "... shall have prior approval in accordance with the Fire Safety Code." R.I.G.L. § 23-28.1-6 in turn requires that prior to the issuance of the building permit, the Fire Marshal must review and approve said plans.

78. R.I.G.L. § 23-27.3-114.4 requires that that the building official sign building permits.

79. Captain Rave's predecessor, Captain Wise, approved the plans submitted in connection with Building Permit A31628.

80. At no point does any applicable law require the signature of a Fire Marshal on a building permit. Therefore, Captain Rave's contention that Building Permit A31628 was invalid without the signature of Captain Wise was incorrect.

81. Accordingly, as of May 23, 2006, Plaintiffs were issued a valid building permit by Defendant Quattrucci that had already received the requisite approval by the Fire Marshal. It is well-settled law in the State of Rhode Island that a party who receives a valid building permit is permitted to rely thereon, and cannot be subjected to additional or different conditions after the issuance of said permit. Building permits are presumptively valid. *See, e.g.*, Shalvey v. Zoning Bd. of Review of the City of Warwick, 210 A.2d 589 (R.I. 1965), Caprio v. Rizzo, 1981 R.I. Super. LEXIS 61 (R.I. Super. Ct. 1981) quoting Sea View Cliffs, Inc. v. Zoning Board of Review of the Town of North Kingstown, et al., 112 R.I. 314, 309 A.2d 20.

82. The Plaintiffs have completed the construction plans approved with the issuance of Building Permit A31628, including that work required to comply with applicable codes under said plans, and have taken other substantial actions in reliance upon the issuance said Building Permit A31628.

83. The provisions for Certificates of Occupancy is governed by R.I.G.L. § 23-27.3-120.2, R.I.G.L. § 23-27.3-120.3, and R.I.G.L. § 23-27.3-120.6, which read, in pertinent part:

> **23-27.3-120.2. Buildings hereafter altered.**
>
> No building or structure subsequently enlarged, extended, or altered to change the use group classification, the fire-grading, the maximum live load capacity, or the occupancy load capacity, in whole or in part, shall be occupied or used until the certificate has been issued by the building official, certifying that the work has been completed in accordance with the provisions of this code, the rehabilitation building and fire code for existing buildings and structures, the fire safety code (chapters 28.1 -- 28.39 of this title) and the approved permits, and all of the applicable codes of all for which a permit is required. Any use or occupancy, which was not discontinued during the alterations, shall be discontinued within

thirty (30) days after the completion of the alteration unless the required certificate is issued by the building official.

**23-27.3-120.3. Existing buildings.**

Upon written request from the owner of an existing building, the building official shall issue a certificate of use and occupancy, provided there are no violations of law or orders of the building official or the fire official pending, and it is established after inspection and investigation that the alleged use of the building has heretofore existed. Nothing in this code shall require the removal, alteration, or abandonment of, or prevent the continuance of the use and occupancy of, a lawfully existing building, unless the use is deemed to endanger public safety and welfare.

**23-27.3-120.6. Contents of certificate.**

The certificate shall certify compliance with the provisions of this code and the purpose for which the building or structure may be used in its several parts, and shall be issued by the building official within ten (10) days after final inspection; provided, that the provisions of the approved permits and of the applicable codes for which permits are required have been met. . . .

84. The provision of a Temporary Certificate of Occupancy is governed by R.I.G.L. § 23-27.3-120.5, which reads:

Upon the request of the holder of a permit, the building official may issue a temporary certificate of occupancy for a building or structure, or part thereof, before the entire work covered by the permit shall have been completed; provided, that the portion or portions may be occupied safely prior to full completion of the building without endangering life or public health, safety, and welfare; and, provided further, that the agencies having jurisdiction over permits issued under other applicable codes are notified of the decision to issue a temporary certificate.

85. At no point do the statutes governing the issuance of certificates of occupancy give the Fire Marshal the authority to reject requests for certificates of occupancy; that authority is reserved to the Building Official.

86. At no point has the Building Official, Albert Quattrucci, determined that any violations of any applicable Code exist.

87. At no point has the Building Official, Albert Quattrucci, made any determination as to whether a Temporary Certificate of Occupancy or a Certification of Occupancy should issue, despite the fact that Narragansett's requests for issuance have been outstanding for at least two months.

88. Defendant Rave has interfered the Narragansett's ability to obtain a Temporary Certificate of Occupancy or Certificate of Occupancy for the 275 Ferris Avenue premises, in that he has 1) attempted to impose additional requirements upon the building project as a condition of receipt of a Certificate of Occupancy, despite the issuance of a valid building permit with approved plans; 2) usurped the Building Official's authority to approve a Temporary Certificate of Occupancy or Certificate of Occupancy; and 3) engaged in obstructive behavior when Narragansett attempted to comply with his demands, such refusing to accept submissions for frivolous reasons, and continuously changing the nature of the demands made upon Narragansett.

89. Defendants Rave and Quattrucci have acted in violation of law, in that 1) Defendant Quattrucci has failed to fulfill his duty to issue a Certificate of Occupancy to Narragansett in accordance with law; and 2) Rave has exceeded the scope of his duties and unlawfully interfered with the issuance of a Certificate of Occupancy to Narragansett.

90. The Defendants, the State Fire Marshal and the Fire Safety Code Board of Appeal and Review, have similarly exceeded the scope of their duties in attempting to assert authority over the issuance of Certificates of Occupancy.

91. At all times pertinent hereto, Defendant Klucznik has acted in concert with and in supervision of Defendant Rave.

92. Immediate and irreparable harm will result if injunctive relief is not granted that would issue Narragansett the Certificate of Occupancy to which it is entitled as a matter of law.

Without a Certificate of Occupancy, Narragansett is unable to begin its manufacturing operations. This inability to begin manufacturing is having and will continue to have the following effects:

a. Narragansett currently has six contracts to produce some 80,000 tons of wood pellets, for a total of approximately $16,000,000. Without the ability to begin manufacturing operations immediately, Narragansett will be unable to meet these contractual obligations in a timely fashion.

b. Narragansett currently has outstanding purchase orders for some $5,500,000 worth of raw materials, but is unable to receive them. Narragansett's inability to accept the waste products that are used for raw materials will create storage problems for its vendors. As matters stand now, Narragansett currently has substantial amounts of raw materials stored on or adjacent to its premises. Additional carloads of raw materials are waiting in transit.

c. Narragansett's inability to fulfill its contractual obligations for finished products or accept shipments of raw material will damage its relationships with its vendors and customers alike, and impair its reputation in the business community in the future.

d. Without the stream of revenue generated by these contracts for its finished products, Narragansett will be unable to remain in business. Even if Narragansett had sufficient resources to relocate, it is unlikely that it would be able to find a site with amenities similar to those located at 275 Ferris Avenue within the State of Rhode Island that are essential to the operations of its business.

e. Unless Narragansett is able to begin manufacturing, it will miss the winter peak time of demand for its product, and the business opportunities flowing therefrom.

f. Narragansett has already had to lay off some 15 of its employees as of October 12, 2006. If immediate relief is not given that will allow it to begin manufacturing operations, Narragansett will be required to lay off an additional 11 employees.

g. The Economic Development authorities of City of East Providence and the State of Rhode Island have made substantial investments in Narragansett. If Narragansett is not permitted to operate, these Economic Development authorities will fail to receive the benefit of their investments.

h. The business climate in the City of East Providence and the State of Rhode Island will suffer, in that the pattern of unlawful, obstructive behavior dealt out to Narragansett will discourage other businesses from locating in this jurisdiction.

93. Plaintiff has no adequate remedy at law; there are no alternative administrative or legislative remedies available and Plaintiff cannot have adequate relief except by the intervention of this Court.

94. No danger to the public health or safety would result by the issuance of a Certificate of Occupancy.

WHEREFORE, plaintiffs request judgment as follows:

a. That Building Official Albert Quattrucci be ordered to issue a Certificate of Occupancy for the 275 Ferris Avenue premises forthwith.

b. That Captain David Rave and all other City officials, the State Fire Marshal, and the State Fire Safety Code Board of Review and Appeal cease and desist from interfering with the issuance of a Certificate of Occupancy for the 275 Ferris Avenue premises, or otherwise interfering with the operations of Narragansett.

**COUNT II – § 1983**

95. Plaintiff realleges those allegations contained in the above Paragraphs as if fully restated therein.

96. Plaintiff had a property interest in its Building Permit, and the subsequent issuance of a Certificate of Occupancy once the approved plans were completed.

97. Defendants deprived Plaintiff of its property interests in violation of its rights to procedural and substantive due process pursuant to Amendment 14 of the U.S. Constitution.

98. At all relevant times, Defendants acted under color of state law.

99. As a direct and proximate result of Defendants' violation of Plaintiff's rights, Plaintiff has suffered pecuniary and non-pecuniary damages.

WHEREFORE, Plaintiff demands judgment against the Defendants, including compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

**COUNT III – INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE**

100. Plaintiff realleges those allegations contained in the above paragraphs as if fully restated therein.

101. Plaintiff derived economic advantage as a result of the issuance of the Building Permit and the expectation of receiving a Certificate of Occupancy upon completion of the approved construction, in that the Plaintiff would be able to begin its business operations.

102. Defendants knew or should have known of the economic advantage derived the issuance of the Building Permit and the expectation of receiving a Certificate of Occupancy upon completion of the approved construction.

103. Defendants willfully and deliberately interfered with the economic advantage derived from Plaintiff's Building Permit and the expectation of receiving a Certificate of Occupancy upon completion of the approved construction.

104. Defendants used improper means, and had improper motives in depriving Plaintiff of the economic benefits derived from Plaintiff's Building Permit and the expectation of receiving a Certificate of Occupancy upon completion of the approved construction.

105. As a direct and proximate result of the illegal activity of Defendants, Plaintiff has suffered great financial loss.

WHEREFORE, Plaintiff demands judgment against Defendants, including but not limited to compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

Narragansett Pellet Corp.
By its attorneys,

Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
October 19, 2006

Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
October 19, 2006

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

STATE OF ~~RHODE ISLAND~~ Massachusetts
Bristol, SC.

I, William S. Carden, President, Narragansett Pellet Corporation, depose and say that I have read the foregoing complaint and know the contents thereof and that the facts alleged therein are true and correct as to my own knowledge except as to those matters alleged on information and belief and to those matters said complaint is true to the best of my knowledge and belief.

William S. Carden

Subscribed and sworn to before me this 19th day of October, 2006.

Cheryl Elderkin
NOTARY PUBLIC
My commission expires:
1/18/2013

CHERYL ELDERKIN
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires Jan. 18, 2013

Narragansett Pellet Corporation
PO Box 16087
East Providence, Rhode Island 02914
PHONE : 508-336-5060
FAX : 508-336-7360

February 2, 2006

Mr. Edward Pimentel, Zoning Officer
Ms. Jeanne M. Boyle, Planning Director
City of East Providence
145 Taunton Avenue
East Providence RI 02914-4505

Mr. Pimentel and Ms. Boyle,

To follow up with our meeting of Tuesday, January 31, 2006, regarding Narragansett Pellet Corp. (NPC), looking to seek occupancy in the "Nyman" Building located at 275 Ferris Avenue, East Providence, RI:

**Purpose:**
NPC is looking to manufacture clean, kiln-dried, non-treated raw material (sawdust) into wood pellets for use in wood pellet stoves and for cogeneration.

**Product/Operation:**
NPC will take the above-stated raw material (which will come into the facility clean, kiln-dried and non-treated) and, with the help of spray water, we will manufacture it into the finished product of wood pellets. This process creates no pollution and no hazardous chemicals or waste. The incoming sawdust will be stored inside the facility. Also, the "hogs" – the loudest piece of equipment – will be used in a sound proof room to allow minimal noise in and around the operation. This interior grinding operation is being used in line with the pellet manufacturing machines to produce a uniform size sawdust. There will be no recycling on the premises, as well as no exterior grinding. The only outdoor operations will be the loading and unloading of trucks.

**Silos:**
The silos will be used for storage of finished product only. There will be no open outside storage.

EXHIBIT A

**Modifications to building:**
A "sawdust room" will be constructed to ensure raw material does not get soiled. Dana Newbrook of AI Designs Ltd is working with engineers to complete this. We will also modify the building to meet any and all safety/compliance standards required by the East Providence Fire Department. Sprinkler systems will be installed/modified as required.

**Storage of machine parts:**
California Pellets (the provider of machinery) has a distribution in Merrimack, NH. All extra parts for machines will be held at the Merrimack facility and brought on-site as needed.

**Truck/Rail Traffic:**
We anticipate 80 trucks/week, 15 rails/week*
We are looking to operate rail/trucks from 7:00am – 6:00pm Monday thru Friday. No weekend traffic.
*In the event that the rails are not being used, the number of trucks per week would be a maximum of 150 trucks/week.

**Employment:**
NPC will employ approximately 38 employees. This operation will run 24-hours per day, 7-days per week. The workday will consist of three, 8-hour shifts.

**Future expansions:**
Any future expansion of NPC at Ferris Avenue will need to be revisited with a new proposal to the City of East Providence.

**Summary:**
NPC is looking to produce 80,000 – 100,000 ton of pellets per year to be distributed to, but not limited to, Lowe's, Home Depot and other various companies domestically and internationally. All new, top-of-the-line, highest-rated industry equipment will be installed. This operation could very well become the showplace for the United States.

If further, more specific information is needed, we would be happy to provide you with what you are looking for. Thank you for your time and consideration to this matter. We look forward to developing a long-term working relationship with the City of East Providence.

**Dated: February** 10**, 2006**

Edward Pimentel
Zoning Officer

Jeanne Boyle
Planning Director

2006 FEB 14 AM 10:40
EAST PROVIDENCE, RI
CITY CLERK

POST THIS CARD SO IT IS VISIBLE FROM STREET

# BUILDING PERMIT

*City of East Providence*

FEE PAID $ 410.00
Received By EH
Date Granted 05 / 23 20 03
Numerical Code A 3149

THIS CERTIFIES THAT FERRIS AVE REALTY Located at 275 FERRIS AVE

has permission to TENANT FIT UP TO EXISTING BUILDING

Map 502 Block 05 Parcel 003.00 Zone I2

provided that the person accepting this Permit shall in every respect conform to the terms of the application on file in this office an to the provisions of the Statutes and Ordinances relating to Zoning, Construction, Alteration and Maintenance of Buildings in th municipality and shall begin work on said building within SIX MONTHS from the date hereof and prosecute the work thereon to speedy Completion. This permit is not interchangeable with ownership of property or contractors.

Any person who shall violate any of the Statutes and Ordinances relating to Zoning, Construction, Alteration and Maintenanc in the municipality shall be punished by penalties imposed by the State Building Code and Local Zoning Ordinances.

**NOTE:** A certificate of occupancy may be required upon completion of construction. Check your building permit application or call 435-7725

Building Official

**BUILDING INSPECTION APPROVALS:**

WORK SHALL NOT PROCEED UNTIL THE INSPECTOR HAS APPROVED THE VARIOUS STAGES OF CONSTRUCTION

FORM INSPECTION — 24-Hour Notice Required Before Inspectio

ROUGH INSPECTION — (Before Lath or Sheet Rock Installation) Appointment Require

INSULATION — (Before Lath or Sheet Rock Installation) Appointment Require

CERTIFICATE OF OCCUPANCY — Allow 4 Days*, Residential — 10 Days*, Commercia

Call Office For Other Required Inspections — Plumbing, Mechanical and Electrica

EXHIBIT B

EAST PROVIDENCE
FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166

Proposed Project– Plan Review Discrepancies

| | |
|---|---|
| **Project #:** | File # 1449 |
| **Project Name:** | New England Pellet Company |
| **Location:** | 275 Ferris Avenue |
| **Date:** | 8-7-06 |
| **Reviewed By:** | Captain David Rave |

| CODE | SECT. | DEFICIENCY |
|---|---|---|
| RILSC | 40.1.4.1 (3) | Occupancy classification should be High Hazard Industrial- Area is subject to accumulations of combustible dust. |
| RIUFC | 1.14.1 | Shop drawings detailing the dust collection system, machinery used in production process, dust house, and silo storage have not been submitted for review. |
| RILSC | 40.3.2.1 | Shop drawings must indicate appropriate protection for particular hazard, such as explosion protection, explosion venting, and suppression. |
| RILSC | 40.1 | Dust explosion protection; Manufacturing process must be in accordance w/ NFPA 664 |
| RILSC | 8.7.2 | Areas subject to deflagration hazard must be in accordance w/ Explosion Protection; NFPA 68, Guide for Venting of Deflagrations. |
| RILSC | 40.1.5 | Classification of Hazard of Contents; High hazard per RILSC 6.2.2.4 |
| RILSC | 40.2.6 | Maximum travel distance to exit exceeds 75' in sections of high hazard occupancy. |
| RIUFC | 13.2.3.3 | Existing standpipe testing and inspection documentation required in accordance<br>w/ NFPA 25 |
| RILSC | 7.10.8.3.1 | Doors being sealed in place must be marked NO EXIT in accordance w/ 7.10.8.3.1<br>Where doors previously served other occupancies both sides of door shall be marked |
| RILSC | 7.11.6 | Doors serving high hazard areas must be equipped w/ approved panic or fire exit hardware if equipped with a latch or lock, per 7.2.1.7.2 |

EXHIBIT C

FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166

| | | |
|---|---|---|
| RILSC | 7.2.1.8.1 | Doors serving high hazard area require self-closing devices, not indicated on print. |
| RILSC | 7.2.4.3.5 | Openings in fire barrier for conveyor system feeding sawdust and raw materials must be protected in accordance w/ RILSC 8.3.4 Opening Protectives. No protection indicated on print. |
| RILSC | 8.3.4 | Duct work to and from Silo storage, dust collection system, and raw materials conveyor must be protected where it passes through 2 hr fire walls |
| RILSC | 7.5.3.3 | Train platform being used as exterior exit access must be separated from the interior of the building by walls and opening protectives as required for corridors, unless served by two remote stairs accessed without traveling past any unprotected opening to reach one of the stairs. Only one stair serves the exterior exit access, and forces occupant past unprotected openings in 2hr firewall and an area that is being used to off load rail cars of raw materials. |
| RILSC | 7.1.10 | There is a strong potential for exterior exit access (train platform) to be blocked by a "Bob Cat" or similar machinery being used to unload sawdust (raw materials). This means of egress forces building occupants to pass through this area to reach the only set of stairs serving the train platform. |
| | | The train platform will not be allowed to serve as a required means of egress unless items 7.5.3.3 and 7.1.10 are met. |
| RILSC | 40.2.4 | Unless train platform is corrected, Area B has only one exit. Three are required. |
| RILSC | 40.2.4.3 | Unless train platform is corrected, Shipping and Receiving has only one exit.<br>Two exits are required. |
| RILSC | 7.1.8 | Guards are required on open side of train platform and around pit for conveyor system. |
| RIUFC | 10.4.3 | Old, wooden, unlabeled doors leading from area B to train platform that are being sealed in place look to much like useable doors with a chain around the door knobs. These doors need to be maintained or removed. |
| RIUFC | 13.6.1.1 | Fire extinguishers seem to be undersized, at least 2A-40BC for the multipurpose extinguishers. Some 2 ½ gallon pressurized water extinguishers should also be provided. |
| RILSC | 8.7.1.1 | Secure storage area needs to be separated from industrial area by 8.7.1.1 (3) |

EAST PROVIDENCE
FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166

| | | |
|---|---|---|
| RILSC | 8.3.4 | Doors from secure storage to pellet processing area must be fire rated per RILSC Table 8.3.4.2 |
| RILSC | 7.2.6.2 | All walls within common lobby and common corridors need to be protected by 1 hr fire resistant rating. Existing A/C units penetrating wall need to be removed. |
| RILSC | 8.3.4.2 | All openings in common corridors 1 hr fire separation must be protected by opening protectives in accordance w/ table 8.3.4.2. |
| RILSC | 8.3.5.1 | Several penetrations of fire rated assemblies in Area A & `B, common lobby by pipes, conduits, and wires need fire stop systems and devices w/ hourly fire resistance rating of assembly in which they are used. |
| RILSC | 7.1.4 | Interior finish of common corridors and lobby not indicated. Must be Class A or B. |
| RILSC | 7.1.4.2 | Interior finish of floor in common corridor and lobby not indicated. Must be Class II. |

**A COPY OF THIS MUST BE RETURNED WITH THE CORRECTED PLANS**

EAST PROVIDENCE
FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7681 FAX: (401) 435-5166

**August 7, 2006**

Mr. William Carden
P.O. Box 16087
275 Ferris Avenue
East Providence, RI 02916

Dear Mr. Carden:

Enclosed is a list of inconsistencies with the Rhode Island Uniform Fire Code and Rhode Island Life Safety Code 2003 editions found during the Plan Review of your proposed construction project to be located at 275 Ferris Avenue East Providence, RI 02916.

If you feel that there will be practical difficulties in the changing of your design of this building or if for any reason you wish to have a hearing to appeal a section of the codes applied, you may apply in writing to the State Fire Safety Board of Appeal and Review for a variation or to have your concerns addressed.

Applications for variations are done on a separate form available from this office. Requests for variation or hearing before the Fire Safety Code Board of Appeal and Review must be submitted. It is the policy of this office that variances for new construction will not be supported. The purpose of these Codes (The Rhode Island Uniform Fire Code and Rhode Island Life Safety Code 2003 editions) are to prescribe minimum requirements necessary to establish a reasonable level of fire and life safety and property protection from the hazards created by fire, explosion, and dangerous conditions (RIUFC 1.2, RILSC 1.2).

***No Building permit will be issued without all fire code issues corrected on these plans.***

Please contact Capt. David Rave of this office and refer to file#1449, 275 Ferris Avenue, should you need additional assistance on this matter. He may be reached at either the phone number on the heading of this letter or at the email address Firemarshal@eastprovidencefire.com.

Sincerely,

Capt. David Rave

Capt. David Rave, Fire Inspector ADSFM
East Providence Fire Department
Fire Marshal

EAST PROVIDENCE
FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166

Proposed Project– Plan Review Discrepancies

| | |
|---|---|
| Project #: | File # 1449 |
| Project Name: | New England Pellet Company |
| Location: | 275 Ferris Avenue |
| Date: | 9-6-06 |
| Reviewed By: | Captain David Rave |

| CODE | SECT. | DEFICIENCY |
|---|---|---|
| RILSC | 40.1.4.1.(3) | Occupancy classification is High Hazard Industrial- Area is subject to accumulations of combustible dust. |
| RILSC | 40.2.6 | Maximum travel distance to exit exceeds 75' in sections of high hazard occupancy, including the train platform. |
| RIUFC | 1.14.1 (20) | Shop drawings detailing the dust collection system, machinery used in production process, dust house, and silo storage are not adequate. Submittals have been limited to generic owners manual, parts lists and installation manuals. We need information on the specific model used and an indication that it is being used and installed in accordance with its listed uses. |
| RILSC | 40.3.2.1 | Shop drawings must indicate appropriate protection for particular hazard, such as explosion protection, explosion venting, and suppression. "Grecon" system requires installation drawings from the manufacturer & system equipment details that indicate that suppression system is being used in accordance with its listing. |
| RIUFC | 1.14.1 | Tremstop IA fire stopping sealant; cut sheets must be provided that indicate its use was in accordance with an approve UL system for that product. The UL system used must be submitted. A letter from the installer is required stating that sealant was applied in accordance with the UL listing. |
| RIUFC | 1.15.3 | Design for dust collection system w/ related suppression and deflagration systems need to be stamped by a RI registered PE. |
| RILSC | 7.10.8.3.1 | Doors being sealed in place must be marked NO EXIT in accordance w/ 7.10.8.3.1<br>Where doors previously served other occupancies both sides of door shall be marked |
| | | |

EXHIBIT D

EAST PROVIDENCE
FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166

| | | |
|---|---|---|
| RILSC | 7.11.6 | Doors serving high hazard areas must be equipped w/ approved panic or fire exit hardware if equipped with a latch or lock, per 7.2.1.7.2<br>If door is rated then fire exit hardware is required. Note 2 on print indicates panic hardware. |
| RILSC | 40.3.2.1<br>9.7.1.1 (1)<br>NFPA 13 | Supervised automatic extinguishing system in accordance w/ NFPA 13. Extra hazard group 1 is required in the following areas per NFPA chapters 5, 8, 11, 14. Area A, machinery section of area B, rail platform area containing open conveyor system, over area B that contains pallet storage of finished pellets exceeding storage footprint by 10%. See Page 9 article 2 of third party review for details. |
| RILSC<br>NFPA 664 | 8.3.4<br>6.2.2.3 | Duct work to and from Silo storage, dust collection system, and raw materials conveyor must be protected where it passes through 2 hr fire walls |
| RILSC | 7.5.3.3 | Train platform being used as exterior exit access must be separated from the interior of the building by walls and opening protectives as required for corridors, unless served by two remote stairs accessed without traveling past any unprotected opening to reach one of the stairs. Only one stair serves the exterior exit access, and forces occupant past unprotected openings in 2hr firewall and an area that is being used to off load rail cars of raw materials. |
| RILSC | 7.1.10 | There is a strong potential for exterior exit access (train platform) to be blocked by a "Bob Cat" or similar machinery being used to unload sawdust (raw materials). This means of egress forces building occupants to pass through this area to reach the only set of stairs serving the train platform. |
| RILSC | 40.1.4.1 (3) | The train platform is designated as a high hazard area due to conveyor system overhead and off loading of raw materials from railcars. This area cannot be used for a means of egress for interior portions of the building. |
| RILSC | 7.5.1.6 | Print indicates exit from train platform as being a door into the shipping and receiving area, also a door from shipping and receiving to the train platform. |
| | | The train platform will not be allowed to serve as a required means of egress unless items 7.5.3.3 and 7.1.10 are met. |
| RILSC | 40.2.4 | Unless train platform is corrected, Area B has only one exit. Three are required. |
| RILSC | 40.2.4.3 | Unless train platform is corrected, Shipping and Receiving has only one exit. Two exits are required. |
| RILSC | 7.2.4.1.2 | Not more than one horizontal exit is permitted to serve each area. |

EAST PROVIDENCE
FIRE DEPARTMENT
*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166

| | | |
|---|---|---|
| RILSC | 7.1.8 | Guards are required on open side of train platform. They should extend to protect most of platform. |
| RILSC | 7.2.6<br>8.3.4.2 | All openings within the common lobby exit passageways require 1 hr fire separation and must be protected by opening protectives in accordance w/ table 8.3.4.2. This includes all windows and doors. |
| RIUFC | 40.1 | Dust explosion protection; Manufacturing process must be in accordance w/ NFPA 664 |
| NFPA 664 | 7.3.2 | All Electrical systems, including Fire Alarm, must be suitable for high hazard combustible dust area, per NFPA 70 NEC.<br>See page 10 #3 and page 12 #1 of third party review report. |
| NFPA 664 | 7.5 | Industrial trucks must be in accordance with NFPA 505. Cut sheets for these trucks are required to be submitted. |
| NFPA 664 | 7.9.2 | Static Electricity. Dust removal equipment must meet requirements of this section. |
| NFPA 664 | 8.2.2.2 | Duct system must meet requirements of this section. No information has been provided about ductwork serving dust collection system. |
| NFPA 664 | 8.2.2.2.3 | Ducts with deflagration hazard must meet one of the requirements of this section. Information about ductwork needs to be provided. |
| NFPA 664 | 8.2.2.5.3. | Dust collector with deflagration hazard. Must meet one of the options of this section. Information not provided. |
| NFPA 664 | 8.4.1.1. | Particulate size reduction equipment. Considered a high frequency ignition source. |
| NFPA 664 | 8.4.2.4.3 | Rooms with size reduction equipment are considered class II, Div. II, hazardous area as defined in article 500 NFPA 70 NEC. |
| | | **ADDITIONAL NOTES** |
| | | Existing standpipe system testing and inspection documentation required in accordance w/ NFPA 25 |
| | | Some of the required fire extinguishers should be 2 ½ gallon pressurized water extinguishers. |
| | | Print indicates a standpipe on exterior wall of train enclosure near dust collection house. Is this going to be a standpipe or is it a PIV? |

A COPY OF THIS MUST BE RETURNED WITH THE CORRECTED PLANS

NPC
Narragansett Pellet Corporation

P.O. Box 16087
275 Ferris Avenue
Rumford, Rhode Island 02916
Ph: 401-434-4800
Fx: 401-434-4842

September 15, 2006

Captain David Rave
East Providence Fire Department
913 Broadway
East Providence RI 02914

RE: Deficiency list dated September 6th, 2006

Dear Captain Rave,

By way of this letter, we do hereby agree to conform and complete the deficiency list by no later than March 31st, 2007.

40.1.4.1 We agree the operation of NPC is to be considered a high hazard area, in area A and the grinder section, located in area B.

**Completed:**

| | |
|---|---|
| RIUFC | 1.14.1 (3M material used –specification sheet attached) |
| RILSC | 7.10.8.3.1 (doors sealed) |
| RILSC | 7.2.6 (1 hour fire rated) |
| RILSC | 8.3.4.2 (1 hour fire rated) |
| RIUFC | 40.1 (This equipment has been purchased thru Grecon. It meets all regulations. Grecon working directly with L. Wenzel.) |

**Prioritizing:**

**30 days:**

| | |
|---|---|
| RIUFC | 1.14.1(20) Shop drawings, etc. |
| RILSC | 40.3.2.1 (add'l shop drawings) Grecon working directly with L. Wenzel |
| RIUFC | 1.15.3 (John Derugeris, CLE Engineering Co.) credentials attached. |
| RILSC | 7.11.6 (panic bars – some completed, still in process) |
| RILSC | 8.3.4 (working on – MAX 30 days) duct work/silo |
| NFPA664 | 6.2.2.3 (working on – MAX 30 days) |

EXHIBIT E

**30 days (con't)**

| | |
|---|---|
| NFPA664 | 7.3.2 (Multi-State Electric working on) (FSSG portion listed in 60 day) |
| NFPA664 | 7.5 (cut sheet for industrial trucks) |
| NFPA664 | 7.9.2 (static electricity) |
| NFPA664 | 8.2.2.2 (duct system information) |
| NFPA664 | 8.2.2.2.3 (duct system information) |
| NFPA664 | 8.2.2.5.3 (dust collector deflagration information) |
| Add'l notes | -Some of the required fire extinguishers should be 2.5 gallon pressurized water extinguishers.<br>-FSSG: Existing standpipe system testing and inspection documentation required in accordance w/ NFPA 25<br>-FSSG: Print indicates a standpipe on exterior wall of train enclosure near dust collection house. Is this going to be a standpipe or is it a PIV? |

**60 days:**

| | |
|---|---|
| NFPA664 | 7.3.2 FSSG portion, including sprinkler, fire alarm |

**90 days:**

| | |
|---|---|
| RILSC | 40.3.2.1 Extinguishing system - FSSG<br>9.7.1.1(1)<br>NFPA 13 |
| NFPA664 | 8.4.11 *(wall for area B. See notes) |
| NFPA664 | 8.4.2.4.3 Multi-State Electric/FSSG if not already done. |

**180 days**

| | |
|---|---|
| RILSC | **40.2.6 (for high hazard area A) |
| RILSC | **7.5.3.3 (train platform-ai design) |
| RILSC | **7.1.10 (train platform-ai design) |
| RILSC | **40.1.4.1(3) (train platform-ai design) |
| RILSC | **7.5.1.6 (train platform-ai design) |
| RILSC | **40.2.4 (contingent on above) |
| RILSC | **40.2.4.3 (contingent on above) |
| RILSC | **7.2.4.1.2 (agreed) |
| RILSC | 7.1.8 (all necessary guardrails will be installed as soon as it is determined where the egress will be) |

*Issue: Requested one-hour wall to enclose manufacturing portion of area B. This type of wall would not enable us to manufacture our wood pellets. We will need to access this equipment with forklifts and to replace parts and/or repair machines. We do agree to enclose the size reduction equipment (grinder) with a 2-hour fire rated wall and make this part of high hazard area A.

**ai designs is working on best route to go by reviewing plans and options.

With regard to the air system, the air is actually being drawn from area B into area A. We will demonstrate for you. Please see attached email from Larry Wenzel.

NPC has a plan in place whereby we will have cleaning crews for the first and third shift, Monday thru Friday and a special cleaning crew to come in on the weekend to get to areas that are more difficult during production time.

The Landlord agrees to guarantee safe passage thru firelanes in adjoining tenant space. This also could be used for tenants needing the get thru our space.

Respectfully submitted,

William S. Carden
President

**William S. Carden**

**From:** William S. Carden [wscarden@npc-ri.com]

**Sent:** Thursday, September 21, 2006 12:02 PM

**To:** Capt. David Rave (firemarshal@eastprovfire.com)

**Cc:** Dana M. Newbrook (d_newbrook@aidesignsltd.com); Karl Bissex (karlbissex@gmail.com); Andrew Nyman (email4nyman@aol.com); Donna Harker (dcharker@npc-ri.com); Lee Blais (lblais@blaisparent.com); Richard Sullivan (rsullivan@starkweathershepley.com); 'MRawson@granoffassoc.com'; 'Inspector@eastprovfire.com'; 'SCunha@firesuppression.com'; 'LWenzel@haifire.com'; John Carden (jcarden777@npc-ri.com); Elaine Carden (ejcarden@npc-ri.com)

**Subject:** Narragansett Pellet Corp.

Dear Captain David Rave

Confirming our meeting of last week we are doing the following:

A. Testing the pellet operation and keeping small separate piles in the chip room. On 9/20/06 FSSG sent to us and we forwarded to you calculations for usage with 4 different sprinkler system set ups. Please advise how much material we can keep in this room under the system modifications.
B. The Grecon system will be installed by Grecon personnel next week and will be tied into the building alarm system as per your request.
C. Ai Design has presented a plan for egress from the north side of Room A. You will have it this week. We are now looking into the cost and how much time it will take to make this happen. This will get done as per your request. We may need up to 9 months for completion.
D. We are in the process of hiring a licensed and bonded industrial cleaning company to maintain a clean area in section B. This includes the platform area. Daily cleaning will be done on all electrical motors, panels, etc. along with the complete B area. On Saturday they will do the high area above the machines. Together this will keep the B area clean with not more than 3mm of dust.

All of this delay and costs have put NPC into difficult cash position. We need our temporary CO.

In reviewing what had happened prior to you coming on the scene: Our first meeting with you was held in early July.

Ai Design and I met with the former Fire Marshal to determine what we had to do. This led us to building the "wall" for the chip room and using the Ai plans to do the equipment and fire regulations lay out. The city of East Providence reviewed our request for planning and zoning. This was approved 2/10/06. In our application we explained the product and operation of NPC. Please see attached.

On May 9th after meeting with all fire officials, fire people from FSSG, insurance and Ai here at 275 Ferris Ave, I sent an e mail to each and every attendee again explaining what we would be doing in our manufacturing operation. In this email, I also asked all attendees to please let me know if they were looking for any further information. See attached.

After receiving the zoning and planning approval, we also received a $99,000.00 loan from the Economic Development Commission of the City of EP. Again everyone was clear on what we would be doing in the former "Nyman" plant. All expressed that it was wonderful and a great boost for the City with adding 35 to 40 new jobs. The State of R.I Economic Development Corporation also gave us a loan.

Then we received on 5/23/06 a Building Permit (A31628) that reads:"Tenant fit up to existing building". Our insurance company is satisfied with all that we have done and have not requested any information or asked us to perform any additional duties/tests.

The point is that we have done all of our planning correctly and are being singled out as I feel a "second class

EXHIBIT F

operation" instead of a new manufacturing company, that is now very rare, making ENERGY from wood waste. The regulations and number of entanglements is the leading reason why more people do not go into manufacturing in the USA. Everything you see now reads "Made in China".

In closing the "Providence Business Journal" is very excited about what we are doing and will do a story about our ENERGY operation in East Providence. We have also been contacted by other media outlets that are very interested in what we are doing.

Best Regards,

Bill Carden
Narragansett Pellet Corporation
P.O. Box 16087
275 Ferris Ave.
Rumford, RI 02916
Phone: 401-434-4800
Fax: 401-434-4842

Ps- we will fax attachments listed above.

# EAST PROVIDENCE FIRE DEPARTMENT

*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166


William S. Carden
P.O. Box 16087
275 Ferris Avenue
Rumford, RI 02916

September 27, 2006

Dear Mr. Carden,

I am in receipt of your e-mail dated Thursday September 23, 2006. In your e-mail, you outlined the events regarding NPC that occurred before I became the Fire Marshal for the City of East Providence. I appreciate you bringing me up to date.

You refer to approvals and a building permit that was issued to you on the application date of 5/23/06. This is the date that the Fire Department received your second set of plans. I do not know why you would have received the building permit on the same day that you submitted your plans to the Fire Department for review. My first day in the Fire Marshal's Office was July 24, 2006; we met on August 1, 2006. As I have informed you since our first meeting on August 1, 2006, the Fire Department has not given approval to this project. We did not sign the building permit that is on file with the building official. After speaking with the former Fire Marshal and reviewing the building permit, it is clear to me that the East Providence Fire Department never gave approval to this project. As you can see from RI State Law, plans and specifications must have prior approval from the Fire Department.

**§ 23-27.3-113.5 Plans and specifications.** – The application for the permit shall be accompanied by not less than three (3) copies of specifications and plans drawn to scale, with sufficient clarity and detail dimensions to show the nature and character of the work to be performed. The plans and specifications **shall have prior approval** in accordance with the Fire Safety Code, chapters 28.1 – 28.39 of this title. When quality of materials is essential for conformity to this code, specific information shall be given to establish such quality; and in no case shall the code be cited or term "legal" or its equivalent be used as a substitute for specific information. The building official may waive the requirement for filing plans when the work involved is of a minor nature.

EXHIBIT G

**§ 23-27.3-115.1 Compliance with code.** – The permit shall be a license to proceed with the work and shall not be constructed as authority to violate, cancel, or set aside any provisions of this code, except as specifically stipulated by modification or legally granted variation in accordance with §§ 23-27.3-127.1 – 23-27.3-127.2.6.

A major reason that this plan review and approval process is taking so long is the lack of accurate information being supplied to the Fire Department by NPC. The plans that were submitted to the Fire Department around April 14, 2006 were nothing more than a two-page floor plan with no detail at all. The plans submitted on May 23, 2006 were slightly better than the first submittals, but still lacking in detail. I can only assume that someone must have indicated that the first set of prints submitted needed more detail, otherwise why would a second set be submitted on May 23, 2006? I believe that at one of your meetings with the former Fire Marshal, he raised the issues of combustible dust concerns and maximum travel distances being exceeded.

A few days after meeting with you and your representatives at the plant on August 1, 2006, I reviewed the plans that you submitted to us on 5-23-06. I rejected these plans and returned to you a three-page list of code deficiencies. I also tried to return the prints to you, however your attorney advised you not to accept them. Since this time, you have known exactly what the Rhode Island Fire Safety Code requirements entailed for the type of operation that NPC will conduct.

You did not feel that those requirements should apply to your operation. You told me to look at other pellet plant operations, namely New England Pellet, because your operation would be a very similar operation to theirs, so I did. I contacted the local Fire Chief and he confirmed my thoughts about the pellet manufacturing operation being very dusty. He even told me of fires and one explosion at the plant, occurring in the pellet machines and the cooling room. After I explained the results of my looking into New England Pellet to you, you told us all that your operation would be nothing like their operation.

You then agreed to hire a third party independent review to look at your process. The RI Fire Safety Code allows the third party review so that an AHJ can get in-depth technical assistance on complicated issues. I chose Hughes Associates and you agreed to hire them.

After about a two week time period, you submitted another set of prints for me to review. This set of prints included what were supposed to be the manufacturers' specifications for all of the equipment used in your manufacturing process and dust-collection system. I specifically explained the features that I needed to see in the detail, yet what I received amounted to nothing more than generic owner's manuals, parts lists, price quotes, MSDS sheets and installation manuals. I submitted a complete set of everything that you gave me to Hughes Associates so that they could review them. Shortly thereafter, Hughes Associates returned a very thorough report based on their review of your submittals. Lee Blais contacted me immediately to let me know that you were disagreeing with what the third party review had concluded in its report.

I was then told by Lee Blais, via e-mail, to rearrange my schedule and the schedules of the other city representatives, not to mention that of Hughes Associates, to get you a quick meeting. We obliged you and met again on September 11, 2006 to discuss the report and deficiencies. It was during this meeting that we discovered "Area A" full of the raw materials that were previously in the railcars. You had asked my permission to use this material and I replied to you in writing that I would not approve the use that specific raw material. This material was brought into the building anyway. Shortly before this meeting, On September 8, 2006, I rejected your submittals a second time and Donna Harker came to pick them up from my office. Those submittals were accompanied by a three-page deficiency report indicating the reasons why your plans and submittals were not approved. Most of the deficiencies were the same deficiencies listed on the first rejection letter.

You gave me some additional "cut sheets" when I met you briefly on Friday September 15, 2006, before your "Grand Opening-Open House". The Information on the 3M Fire Barrier is not the correct information. You have given me the MSDS information for the product. Please refer to the list below for details. The Reliance Electric Motors information indicates that the motor is suitable for Division II atmospheres. Where is this motor used? Is this the only motor type used for the entire process?

Nowhere on any of your prints have you indicated the size or number of 2000 lb. soybean oil totes that will be used with the pellet machines. All along you have been talking about adding "a little vegetable oil now and then" to the process. I think soybean oil usage in the volume that you will have in the plant deserves an indication of such on the floor plan at least, not to mention on the detail of the machinery layout. Class IIIB combustible liquid of this volume requires certain protection.

This is how the project has been thus far. The fire department gets to see the puzzle one piece at a time instead of the entire picture. This is why you have delays. Please save all of your technical information to be submitted at the time when you submit your revised prints. This will lessen the possibility of some information getting lost.

You have referred to obtaining a temporary Certificate of Occupancy on a few different occasions. In order for a temporary certificate of occupancy to be issued the fire protection and life safety features required of an occupancy must be operational and at a level that the AHJ finds acceptable.

The issues of fire protection and life safety should not be taken lightly. You have asked in the past if there is anyway to relax the fire code, maybe not look at it so strictly. You refer to the regulations and number of "entanglements" as a reason for manufacturing being moved out of the USA, however, there are very good reasons for these "entanglements". Each and every fire code is a direct result of a past tragedy. Hundreds of lives have been lost through our history because someone somewhere ignored existing fire codes. Each tragic loss of life brings about new, more restrictive fire codes. As the years go by and life goes on, those tragic losses become very distant and placed out of our thoughts. This is when the regulations start to seem ridiculous at times and seemingly

become obstacles that need to be circumvented. This is when history has a danger of repeating itself.

Please review the following list of Items. These Items must be in place in order for a temporary Certificate of Occupancy to be considered.

1. The East Providence Fire Department recognizes your effort to contract with a private housekeeping company to try to minimize accumulations of combustible dust in your facility. However, the East Providence Fire Department does not approve of entering into a long term monitoring / inspection process to ensure that you maintain such vigilance with regard to combustible dust accumulation. This would be an inspection process that would need to continue for the lifetime of NPC. There is always a margin for human error in this type of arrangement. Therefore, the East Providence Fire Department is considering "Area B" a high hazard area due to the potential for combustible dust accumulations. This classification was also given to "Area B" in the report by the third party review. "Area B" contains "a particulate size reduction" piece of equipment, which is required by NFPA 664 to be in a Class II Division II area. You have offered to enclose this piece of equipment with a new 2-hour fire barrier and incorporate it into "Area A". This would create yet another 2-hour fire barrier that contains penetrations from dust collection ductwork and a conveyor system that cannot be protected with listed fire dampers, due to the nature of the manufacturing process. NFPA 664 states that a fire barrier should not be penetrated by ductwork used to convey combustible materials. Fire dampers cannot provide reliable operation over the lifetime of the facility, due to wood waste clogging the dampers, rendering them inoperative. We will not approve penetrations in this 2-hour fire barrier if they cannot be protected with listed dampers. We need you to give us a reasonable time period for you to bring this section of the building into compliance with the requirements of a high hazard industrial occupancy.

2. A detailed drawing of the dust collection system, relating to explosion construction or venting of ductwork and dust collector. The suppression system detail should also be included. This design must be stamped by a RI registered Professional Engineer.

3. A complete set of submittals that can be reviewed and approved by the Fire Marshal, including upgraded sprinkler system design, fire alarm and electrical designs appropriate to the occupancy classification.

4. The new fire alarm needs to be 100 % operational and acceptance tested in the NPC section of the building.

5. The electrical systems and system components in must be in accordance with Article 502 or 503 of NFPA 70, National Electrical Code.

6. Exit signs and emergency lighting shall be installed.

7. Fire extinguishers shall be located in accordance with NFPA 10.

8. I received the existing sprinkler system calculations from FSSG. The submitted data states that you will be replacing existing heads with K-factor 8.0 heads. It does not give sprinkler identification numbers for the heads; Therefore, we cannot determine if the heads are listed for the application of an extra hazard area. The calculations need to show that a flow at the specified density is attainable. FSSG needs to tell me how much material can be kept in "Area A" and adequately protected by the existing sprinkler design. This will also apply to the amount of finished product to be stored on pallets in the finished product area. Hughes Associates will confirm the results of any such calculations. The size of these piles will be marked off as to spacing, diameter and height.

9. A design for the protection of the soybean oil totes needs to be submitted and approved. This protection system must also be in place and operational. The level of sprinkler protection must meet that outlined in RIUFC (NFPA 1) Table 66.4.8.2(i). If this cannot be accomplished, an alternative suppression system of dry chemical, CO2, or foam as outlined in the MSDS information that you supplied to me. Guard posts required by RIUFC 60.1.16.1 & 60.1.16.2 need to be installed to protect the totes.

10. Footnote (b) of table 66.4.8.2(i) RIUFC chapter 66 requires the soybean totes to be subjected to a standardized fire test and to be listed and labeled as such.

11. If the suppression system to protect the soybean oil is anything other than the sprinkler system, a mechanical permit is required and the suppression system must be reviewed by the Fire Department for approval.

12. The 3M fire barrier sealant is only effective when it is used as tested to achieve its listed fire rating. You need to supply me with the UL listed assembly that was used for your application of the product. You should have gotten this from the product manufacturer before you used the product to be sure that you used it in a manner in which it was tested. I need something in writing from the person that applied the sealant that indicates they applied it in a manner consistent with the manufacturers' specifications. You have given me information on Tremstop IA as well. This information was also limited to MSDS. If you also used the Tremstop IA I need to see its UL listed use as well, and a written statement from the installer.

13. All penetrations in all of the fire barriers must be fire stopped. As of my last visit several penetrations were still in the fire barriers and had not been fire stopped. I am not referring to the areas penetrated by the conveyor system.

14. If you are seeking an alternative way of protecting the fire barriers where the conveyor system passes through, you need to seek a variance from the RI Fire

Safety Code Board of Appeal and Review to use something other than a listed damper.

15. The plan and construction for egress that will reduce travel distances to within the 75' maximum travel distance. At least some portion of this need to be in place. A nine-month completion date for means of egress construction is not acceptable

16. Existing Standpipe need test and inspection documentation.

17. Technical sheets for the "Bobcats" and other powered industrial trucks to be used in the high hazard area. These sheets should indicate that the industrial trucks are suitable to use in a combustible dust atmosphere.

18. A timeline for completion of all deficiencies shall be presented. The deadlines must be met and progress to completion must be shown. Completion dates for sprinkler system upgrading, electrical system upgrading and means of egress should be presented.

During the period covered by the temporary Certificate of Occupancy the scope of operations will be limited, so as not to create a high hazard atmosphere. The hours of operation should be limited to 1st and 2nd shifts only, so as to allow construction work to be done in the off hours. The Fire Department will require the hiring of a detail firefighter to be present during the two work shifts to ensure that the raw materials and palletized storage amounts are not exceeded in predetermined areas. This would also ensure that egress routes are kept open.

It should be noted that the RI State Fire Marshal's Office has been informed of the situation at NPC and is in full support of the East Providence Fire Marshal's Office.

Sincerely,

____________________________

Captain David Rave, ADSFM

Blais Parent & Quinn

Attorneys at Law

20 Cabot Boulevard
Suite 300
Mansfield, Massachusetts 02048
(508) 618-1280

Leon A. Blais, Esq.

LBlais@BlaisParent.com
Fax: (617) 812-0459

September 29, 2006.

Captain David Rave
Fire Marshal
East Providence Fire Department
913 Broadway
East Providence, RI 02914

Mr. Albert Quattrucci
Building Official
City Hall
East Providence, RI 02914

**By E-Mail Only**

**Re: Narragansett Pellet Corp.**

Gentlemen:

I am writing on behalf of Narragansett Pellet Corp. in response to Captain Rave's letter of September 27, 2006. This letter is jointly addressed to Captain David Rave and Building Inspector Albert Quattrucci inasmuch as Rhode Island state law makes the building official responsible for issuance of certificates of occupancy and temporary certificates of occupancy.

A quick history of Narragansett's history in East Providence is appropriate. NPC is in the business of manufacture of wood pellets to be burned in specially built wood stoves. The feedstock for this product is wood product that would otherwise be deposited in landfills. This is a highly desired product in periods of high energy prices.

Last Spring NPC's architect, Ai Design, contacted the Building Official's office. Plans for refitting of a portion of the former Nyman Manufacturing facility on Ferris Avenue were submitted. One or more conferences were held with Captain Rave's predecessor. Several changes suggested were made in the contemplated work, including construction of a wall to separate a potentially dusty area from the remainder of the work space. On May 23, 2006 building permit A31628 was issued for the work requested. The description of the work included on the building permit was extremely broad to encompass everything necessary to accommodate the intended use of the Nyman building: "Tenant fit up to existing building".

All zoning and other municipal approvals had earlier been obtained. Interestingly, the City of East Providence has lent money to NPC as part of its economic development effort.

EXHIBIT H

The necessary equipment was ordered and labor began to implement the approved plans almost immediately. In late Summer Captain Rave, now the city's fire marshal, informed NPC management during several exchanges, both written and oral, that the plans previously submitted resulting in a building permit issued to NPC are unsatisfactory. Additional fire and life safety code improvements potentially costing several hundred thousands of dollars have been required.

In addition to the added cost of these items, NPC is significantly behind in its effort to produce product for the upcoming heating season and is at risk of losing several major customers. Indeed, the very existence of this business is at risk. All of this has occurred because the company in good faith detrimentally relied on the building permit issued last May.

NPC and its representatives have met frequently with city representatives in order to cooperate to the extent feasible in installing fire code and life safety upgrades. The object of these efforts has been to make sufficient upgrades to obtain a temporary certificate of occupancy while permanent improvements are installed. Such a temporary certificate is specifically authorized at R.I. Gen. Laws § 23-27.3-120.5.

NPC is keenly aware of the sensitivity of issues surrounding fire and life safety codes. However, all should be aware that the policy of the state of Rhode Island generally is to treat code enforcement of vacant industrial properties, such as the Nyman property, from a different perspective. In pertinent part Rhode Island law states:

*§ 23-29.1-1. Legislative findings and purpose*

*The general assembly finds and declares:*

*(1) That there are throughout Rhode Island existing buildings and structures that are vacant or partially vacant and/or underutilized because rehabilitation of such buildings and structures to conform to the requirements for new structures under building and fire safety codes, is prohibitively expensive or impractical;*

*(2) That buildings and structures that are vacant or partially vacant constitute a public safety threat because of a lack of occupancy and a lack of investment in modernization and maintenance;*

*(3) That the presence of vacant and or partially vacant buildings and structures contributes to blight and or to the loss of economic viability of traditional city, town or village centers;*

*(4) That reinvestment in existing buildings and structures will strengthen local tax bases and provide employment opportunities in construction and building trades;*

*(5) That it is the purpose of this chapter to provide a code and regulations for repairing, rehabilitating, altering, improving, adding to and changing the use of existing buildings and structures in a manner that assures the health, welfare and safety of occupants and that facilitates designing improvements to existing buildings and structures to the code in an optimum manner with a minimum need to for variances; and*

*(6) That it is further the purpose of this chapter to provide a single uniform, statewide, harmonious rehabilitation building code with building code and fire safety code elements applicable to existing buildings and structures.*

Further,

*(b) In existing structures, since it is not always practical or efficient to strictly apply all of the provisions of the code, the authority having jurisdiction shall have the power to implement and enforce the provisions of the code as provided for in the Uniform Fire Code (NFPA 1) and the Life Safety Code (NFPA 101) with annexes, as applicable to existing structures, consistent with such rules and regulations as may be adopted and such decisions as may be rendered by the Fire Safety Code Board of Appeal and Review.*

*(c) Application of the code to new and existing structures shall be consistent with such blanket variances, variances, and rules, as may be approved by the Fire Safety Code Board of Appeal and Review, and such modifications as may be issued in writing by the authority having jurisdiction, in accordance with NFPA 101, with annexes.*

*R.I. Gen. Laws § 23-28.1-6*

In short, it is the public policy of Rhode Island to be reasonable and flexible in implementation of codes in the reuse of vacant industrial properties.

Please know, however, that NPC is not seeking to evade its responsibility to do all it can to keep its employees, public safety employees and the general public safe. It seeks only some flexibility in both time and means to achieving the common objective of safe operations.

Thus, without waiver of any rights or remedies it may have at its disposal, NPC herewith responds to the items listed by Captain Rave as conditions for a temporary certificate of occupancy. It is important to note that much of the information contained herein was submitted by NPC in a letter from NPC President William Carden to Captain Rave dated September 15, 2006. No reply has been received. That letter is supplemented by the information herein.

NPC responds in serial fashion to the items outlined in Captain Rave's letter of September 27, 2006:

1. This item addresses the so-called "Area B" considered by the fire department to be a high hazard area. We disagree but will attempt to deal with that designation under protest. NPC's plan is to build a new fire rated wall to contain the grinder within "Area A" which is without question a high hazard area. The issue of protection for the corkscrew conveyor will be dealt with by a flooding mechanism directed at the conveyor and/or a listed damper. This will be accomplished within 90 days.

2. The detailed drawing stamped by a RI Engineer will be completed within 14 days. It is our understanding that the City's consultant, Larry Wenzel as already been in communication with the representative of Grecon, the dust collection system manufacturer.

3. Sprinkler fire alarm and electrical designs have already been submitted or will be submitted by October 2206. The electrical inspector visited the premises on September 25, 2006 and has indicated that the present electrical installation is satisfactory.

4. The new fire alarm will be operational within 14 days.

5. The electrical systems have been inspected, as indicated above. Further we understand that Mr. Wenzel has approved dust proof electrical junction boxes for use.

6. There are existing exit signs and emergency lighting in the premises. These will be upgraded to code within 30 days.

7. Fire extinguishers shall be located in accord with NFPA 10 within 7 days. These will be 2.5 gallon pressurized water extinguishers in all areas except in the soybean oil storage area which will contain dry extinguishers.

8. Until permanent sprinkler heads can be installed we propose operations in Area A by storage there only of the maximum amount of feedstock that can be protected by the existing system. If Mr. Wenzel could provide what amount of feedstock can be accommodated we will act accordingly. In the meantime, Karl Bissex is going to calculate the optimum amount of feedstock that NPC would like to store in Area A. We would also appreciate Mr. Wenzel's calculation of the proper sprinkler to accommodate that amount. We would like to complete these calculations within 7 days and to complete final sprinkler installation within 60 days or sooner.

9-11. NPC will reduce the amount of soybean on the premises to four totes, one for each machine. The existing sprinkler system will be used for suppression and will be supplemented by dry extinguishers in the tote area. Guard posts will also be installed. This will be accomplished within 14 days.

12 The documentation regarding fire barrier sealant will be supplied in 7 days or less.

13. Stopping of fire barrier penetrations will be completed in 14 days. This is mostly completed now. Detail of the penetrations about which Captain Rave would be very helpful.

14. NPC will be seeking a variance regarding an alternate means of protecting fire barriers through which conveyors pass.

15. Perhaps the most problematic issue with which we have dealt is the egress plan. Imminently, Ai-Designs will submit a plan of egress that I understand has already been discussed. This plan essentially adopts the "tunnel" approach espoused by Larry Wenzel. Once this plan has been approved NPC will immediately seek contractor bids and will authorize the beginning of construction immediately. This project will be completed within six months of approval of the Ai Design plan.

16. The test and inspection documentation for the existing standpipe will be provided by FSSG within 7 days.

17. The technical sheets for the Bobcat units will be provided within 7 days.

18. The requested time projects are contained in this letter.

There are two final items to be addressed.

The first relates to Captain Rave's contention that operations should be limited to two shirts during the temporary certificate of occupancy period in order to prevent a high hazard area and to accommodate construction. We do not see that the type of construction to be undertaken to implement the egress plan will in any way add to hazard. And, we believe that construction can be accommodated with existing operations.

The second relates to the requirement that a detail firefighter be on premises during all production periods during the temporary certificate of occupancy period. By my calculations this could cost as much as $5400 per week given full operation. Given the major additional expenses created by added code requirements this is an expenses NPC simply cannot absorb. We propose two alternatives. The first is that NPC would pay for one hour of detail firefighter time per production day for a daily inspection of our premises. This could be done at random times. The second is that NPC would establish a connection to fire headquarters of the CCTV system within the plant. This could be done, we believe, via internet.

In conclusion, it is of utmost urgency that NPC gets into operation. NPC needs a temporary certificate of occupancy immediately and proposes the plan contained herein toward that end. NPC requests an expeditious response to the proposals herein, including egress plan review.

We do not wish this process to be contentious. We request your cooperation and pledge ours.

Sincerely,

Lee Blais
Attorney at Law

NPC
Narragansett Pellet Corporation

P.O. Box 16087
275 Ferris Avenue
Rumford, Rhode Island 02916
Ph: 401-434-4800
Fx: 401-434-4842

October 4, 2006

Captain David Rave
Fire Marshal
City of East Providence Fire Department
913 Broadway
East Providence RI 02914

Mr. Albert Quattrucci
Building Official
City of East Providence
145 Taunton Avenue
East Providence RI 02914

Dear Captain Rave,

In response to our letter dated September 29th, 2006, to follow please find, to date, all conditions and status of each:

1. Please see new, revised plans, prepared by ai Designs. These plans include the "particulate size reduction" piece of equipment (now in area B) be included in the agreed upon high hazard area A. This should eliminate the need to classify Area B a high hazard area and contain all points of concern in area A. These plans also reflect the change requested for egress in #15. We will now await your approval to these plans. Once approved, we will also deal with getting estimates for work to be done on the "flooding mechanism" directed at the conveyor and/or a listed damper. Time to complete (upon your approval) is estimated at 90 days.
2. The detailed drawing has been emailed and mailed to our RI PE. His credentials are attached for your review. He will be in direct contact with Karl Bissex, our engineer for this project, to resolve any questions he may have. We anticipate having the "sign off" of these plans by October 16th.
3. I spoke to Steve Cunha (FSSG) this morning. He has a call into Inspector Bob Powers and is awaiting his call back. Steve said he has the fire alarm plans sitting on his desk until he can meet with Mr. Powers. As far as the sprinkler system goes, Steve is waiting to hear from you as far as which plan (out of 6 submitted to you) he needs to go with to ensure life/safety code compliance. I am attaching a copy of what Steve has already submitted to you for your recommendation. We are also including the new fire alarm plans with this letter today.
4. Again, after speaking with Steve Cunha (FSSG), target date for the fire alarm to be fully operational is October 16th.
5. The new Electrical Inspector (Gary Antonio) for the City of East Providence was on-site at NPC on October 3rd. He is working with Multi-State Electric to determine what needs to be done.

EXHIBIT I

6. ai Designs emailed plans to Steve Cunha at FSSG today. FSSG is now going to determine work that needs to be done in regards to exit signs and emergency lighting in the premises. FSSG will submit to Ferris Avenue Realty (owner of 275 Ferris Avenue building) an estimate for cost to do this work. Once the estimate is approved by the owners and better time frame estimate can be submitted. However, we are estimating 30 days on this point.
7. Fire extinguishers: FSSG has their fire extinguisher person coming to our facility on Thursday, 10/5. Some extinguishers will be here on Friday, 10/6. All others will be here by 10/13.
8. Sprinkler systems: Karl Bissex, NPCs engineer, submitted an email dated today to Larry Wenzel, along with other recipients. The email contained chip room volume calculations. Larry Wenzel of Hughes Associates will be determining the calculation of the proper sprinkler to accommodate that amount. Larry emailed us on 10/4 at 6:15pm with calculations. Steve Cunha will now work with Chris Johnson (at FSSG- sprinkler system division) on which sprinkler system is appropriate for these calculations. We can assure you that the sprinkler systems will be installed and operational as soon as possible, as the lives and safety of our employees and this operation is very important to us. We will say 60 days on this item, in hopes that the work can be completed sooner.

9-11. NPC has agreed to reduce the amount of soybean oil on-site. FSSG will have dry extinguishers in the facility no later that October 13th (as mentioned in #7). Guard posts will also be installed. This will be completed by October 16th.

12. An 11-page product description, along with proper application techniques, material safety data sheet, etc is attached for your review. Also, a letter from Richard Carden, Plant Manager who applied the caulking is attached. We hope this satisfies this condition.
13. Stopping of fire barrier penetrations will be completed in 14 days. Most of this work is complete. Again, detail of the penetrations about which Captain Rave is referring would be very helpful.
14. NPC will be seeking a variance regarding an alternate means of protecting fire barriers through which conveyors pass. The variance will be in regards to the conveyors moving from the train platform to the shipping/receiving area, in addition to the conveyors moving from hopper in train platform to Area A. However, by containing the "particulate size reduction" piece of equipment per the plans attached (see #1), this helps to enclose the "open conveyor" that moved from Area A to Area B and keeps it confined to area A. ai Designs will be submitting the variance application within one week of today and (depending on when we get on the schedule) we are hoping to have approval within three weeks. We are unclear how far out the committee is scheduling, so we will keep you posted on that.
15. Please see attached plans (same as #1). These new plans also reflect the action plan for egress. Once this plan has been approved by you, NPC will immediately seek contractor bids and will authorize the beginning of construction immediately.

16. Andrew Nyman, Property Manager for Ferris Avenue Realty, is working on this. He is waiting to hear from Simplex Grinnell to finalize an appointment date. We will keep you posted on this.
17. The technical sheets for the Bobcat units are attached. We hope this satisfies this condition.

We are anxiously awaiting your response in this matter.

Respectfully submitted,

William S. Carden
President

Attachments:

-Original letter from NPC dated September 29th, for your reference.
- #1 New plans from ai Designs – reflecting egress and emergency lighting
- #2 RI PE Credentials (John A. DeRugeris)
- #3 Complete set of new fire alarm plans
- # 8 Email from Karl Bisses regarding chip room volume calculations
- #8 Six sprinkler options
- #12 3M Fire Barrier Caulk, 11- pages from the manufacturer directly. Letter from Richard Carden, Plant Manager and person that applied product.
- #17 Bobcat spec sheets. If not enough information, you may contact Jim Morse at JJ Gregory in East Providence. 401.639.3982

Mr. Blais, October 4, 2006

I am in receipt of both of your e-mailed letters from September 29, 2006 and October 4, 2006 respectively.

The first thing that you should realize is that I am not an employee of NPC. I am an employee of the City of East Providence. As such, I have an obligation to offer my services to many other people who, like yourself, have deadlines to meet. As you are aware NPC has gotten more than its share of my undivided attention, however you cannot expect me to drop everything the moment you send me an e-mail.

In my letter dated September 27, 2006, I did indeed respond to Mr.Carden's previous letter. Many of my points address issues with the unacceptable and unclear timelines that he presented. The organization of that letter was very difficult to understand.

I have received the "Area A" chip calculations from Karl Bissex. FSSG needs to make sure that the sprinkler system can adequately protect the volume of combustibles in the room.

In a portion of your first letter you quoted enabling legislation that was used when the Rehabilitation Code was adopted. NPC never indicated that they would like to be reviewed under the Rehabilitation Code. However, if NPC had requested to use the Rehabilitation Code they would have been denied the use of that code. The Rehabilitation Code section 101.1.1 does not allow the use of this Code for High Hazard Occupancies.

I understand that you are requesting a Temporary Certificate of Occupancy. As I have explained to you in the past, the ability to issue NPC a TCO is beyond the scope of my authority. The State Fire Marshal has already granted you a TCO for your open house on September 16, 2006 for a 4 hour time period. I have furnished you with a list of requirements that need to be in place before I will recommend granting you a TCO through the State Fire Marshal. The list of items is non-negotiable. At this point you have one option available to you. I have attached a copy of Formal Interpretation #06-09 Temporary Certificates of Occupancy.

At this time I request that any further correspondence between you and I be in the form of certified mail.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

EXHIBIT J

Office (401) 222-3189

FAX (401) 222-1032

TDD# (401) 222-6334

FIRE SAFETY CODE
BOARD OF APPEAL AND REVIEW

272 West Exchange Street

Suite 301

Providence, RI 02903

# INTERPRETATION

**FILE NO.: 06-09**

**MUNICIPALITY: Statewide**

**REQUESTED BY: State Fire Marshal**

**SUBJECT: Temporary Certificates of Occupancy**

**APPROVED ON: 2006-07-25**

FIRE SAFETY CODE BOARD OF APPEAL & REVIEW
FORMAL INTERPRETATION &
BLANKET VARIANCE 06-09

(MODIFYING DETERMINATION # 2
OF FORMAL INTERPRETATION &
BLANKET VARIANCE 05-12 )

General Background: The State Fire Marshal's Office has requested that the Fire Board revisit and modify FORMAL INTERPRETATION & BLANKET VARIANCE 05-12. In 05-12, the State Building Commissioner had requested clarification of certain issues surrounding the issuance of Temporary Certificates of Occupancy. The second question of the Building Commissioner and the Response of the Board involved the approval of the issuance of a Temporary Certificate of

Occupancy by the State or Local Fire Marshal. The Board's response, at that time, was as follows:

2. When the owner of a building under construction requests permission to occupy the structure prior to completion of the building and installation and testing of all life safety-related issues only the Fire Safety Code Board of Appeal & Review has the authority to authorize the Fire Marshal (local or state AHJ) to approve the issuance of a T.C.O. Neither the State Fire Marshal, nor the local Fire Code AHJ, has the authority to approve the granting of this limited period of occupancy when there are outstanding fire code deficiencies. In these situations, the building owner must file such requests with the Fire Safety Code Board of Appeal & Review. This policy has been established for many reasons including the creation of uniform state-wide safeguards in these situations.

The State Fire Marshal has requested that he, or a designee from his office, also be granted the authority to authorize a local or State AHJ to approve the issuance of a T.C.O. The granting of this request would allow his office to immediately address any time-sensitive requests for such approval. The State Fire Marshal has also requested that the above authority be effective on the date that this matter was reviewed and approved by the Board – July 25, 2006.

Determination of the Board: The Board hereby modifies and amends its above response to question number 2 of FORMAL INTERPRETATION & BLANKET VARIANCE 05-12 in order to allow the State Fire Marshal, or his designee, in addition to the Fire Safety Code Board of Appeal & Review, to authorize a local or State AHJ to approve the issuance of a Temporary Certificate of Occupancy (TCO) by the State and/or local Building Official. Such approval by the State Fire Marshal, or his designee, shall be in writing. The above modification and amendment of 05-12 was approved on July 25, 2006 and shall be effective as of that date.

NPC
Narragansett Pellet Corporation

P.O. Box 16087
275 Ferris Avenue
Rumford, Rhode Island 02916
Ph: 401-434-4800
Fx: 401-434-4842

October 10, 2006

Captain David Rave
Fire Marshal
City of East Providence Fire Department
913 Broadway
East Providence RI 02914

Mr. Albert Quattrucci
Building Official
City of East Providence
145 Taunton Avenue
East Providence RI 02914

Captain Rave,

In addition to the partial package you received on October 5th, 2006 (after attempting on October 4th, unsuccessfully to submit materials – hence the delay in some of these materials), here are a few other conditions that are being met:

1) we are attaching revised plans from ai Designs reflecting egress and grinding machine in Area B, to be included in Area A.
2) also attached are signed engineer designs by John DeRugeris, a Rhode Island PE.
3) An email from Andrew Nyman, Property Manager, stating that the standpipe is being inspected by Simplex Grinnell tomorrow, October 11th.

We will continue to submit these conditions as the requested materials are made available to us. Thank you for your time and attention to this matter.

Regards,

William S. Carden
President

EXHIBIT L