*Blais Parent & Quinn*

*Attorneys at Law*

*20 Cabot Boulevard*
*Suite 300*
*Mansfield, Massachusetts 02048*
*(508) 618-1280*

*Leon A. Blais, Esq.*

*LBlais@BlaisParent.com*
*Fax: (617) 812-0459*

September 29, 2006

Captain David Rave
Fire Marshal
East Providence Fire Department
913 Broadway
East Providence, RI 02914

Mr. Albert Quattrucci
Building Official
City Hall
East Providence, RI 02914

**By E-Mail Only**

**Re: Narragansett Pellet Corp.**

Gentlemen:

I am writing on behalf of Narragansett Pellet Corp. in response to Captain Rave's letter of September 27, 2006. This letter is jointly addressed to Captain David Rave and Building Inspector Albert Quattrucci inasmuch as Rhode Island state law makes the building official responsible for issuance of certificates of occupancy and temporary certificates of occupancy.

A quick history of Narragansett's history in East Providence is appropriate. NPC is in the business of manufacture of wood pellets to be burned in specially built wood stoves. The feedstock for this product is wood product that would otherwise be deposited in landfills. This is a highly desired product in periods of high energy prices.

Last Spring NPC's architect, Ai Design, contacted the Building Official's office. Plans for refitting of a portion of the former Nyman Manufacturing facility on Ferris Avenue were submitted. One or more conferences were held with Captain Rave's predecessor. Several changes suggested were made in the contemplated work, including construction of a wall to separate a potentially dusty area from the remainder of the work space. On May 23, 2006 building permit A31628 was issued for the work requested. The description of the work included on the building permit was extremely broad to encompass everything necessary to accommodate the intended use of the Nyman building: "Tenant fit up to existing building".

All zoning and other municipal approvals had earlier been obtained. Interestingly, the City of East Providence has lent money to NPC as part of its economic development effort.

EXHIBIT H

The necessary equipment was ordered and labor began to implement the approved plans almost immediately. In late Summer Captain Rave, now the city's fire marshal, informed NPC management during several exchanges, both written and oral, that the plans previously submitted resulting in a building permit issued to NPC are unsatisfactory. Additional fire and life safety code improvements potentially costing several hundred thousands of dollars have been required.

In addition to the added cost of these items, NPC is significantly behind in its effort to produce product for the upcoming heating season and is at risk of losing several major customers. Indeed, the very existence of this business is at risk. All of this has occurred because the company in good faith detrimentally relied on the building permit issued last May.

NPC and its representatives have met frequently with city representatives in order to cooperate to the extent feasible in installing fire code and life safety upgrades. The object of these efforts has been to make sufficient upgrades to obtain a temporary certificate of occupancy while permanent improvements are installed. Such a temporary certificate is specifically authorized at R.I. Gen. Laws § 23-27.3-120.5.

NPC is keenly aware of the sensitivity of issues surrounding fire and life safety codes. However, all should be aware that the policy of the state of Rhode Island generally is to treat code enforcement of vacant industrial properties, such as the Nyman property, from a different perspective. In pertinent part Rhode Island law states:

*§ 23-29.1-1. Legislative findings and purpose*

*The general assembly finds and declares:*

*(1) That there are throughout Rhode Island existing buildings and structures that are vacant or partially vacant and/or underutilized because rehabilitation of such buildings and structures to conform to the requirements for new structures under building and fire safety codes, is prohibitively expensive or impractical;*

*(2) That buildings and structures that are vacant or partially vacant constitute a public safety threat because of a lack of occupancy and a lack of investment in modernization and maintenance;*

*(3) That the presence of vacant and or partially vacant buildings and structures contributes to blight and or to the loss of economic viability of traditional city, town or village centers;*

*(4) That reinvestment in existing buildings and structures will strengthen local tax bases and provide employment opportunities in construction and building trades;*

*(5) That it is the purpose of this chapter to provide a code and regulations for repairing, rehabilitating, altering, improving, adding to and changing the use of existing buildings and structures in a manner that assures the health, welfare and safety of occupants and that facilitates designing improvements to existing buildings and structures to the code in an optimum manner with a minimum need to for variances; and*

*(6) That it is further the purpose of this chapter to provide a single uniform, statewide, harmonious rehabilitation building code with building code and fire safety code elements applicable to existing buildings and structures.*

Further,

*(b) In existing structures, since it is not always practical or efficient to strictly apply all of the provisions of the code, the authority having jurisdiction shall have the power to implement and enforce the provisions of the code as provided for in the Uniform Fire Code (NFPA 1) and the Life Safety Code (NFPA 101) with annexes, as applicable to existing structures, consistent with such rules and regulations as may be adopted and such decisions as may be rendered by the Fire Safety Code Board of Appeal and Review.*

*(c) Application of the code to new and existing structures shall be consistent with such blanket variances, variances, and rules, as may be approved by the Fire Safety Code Board of Appeal and Review, and such modifications as may be issued in writing by the authority having jurisdiction, in accordance with NFPA 101, with annexes.*

*R.I. Gen. Laws § 23-28.1-6*

In short, it is the public policy of Rhode Island to be reasonable and flexible in implementation of codes in the reuse of vacant industrial properties.

Please know, however, that NPC is not seeking to evade its responsibility to do all it can to keep its employees, public safety employees and the general public safe. It seeks only some flexibility in both time and means to achieving the common objective of safe operations.

Thus, without waiver of any rights or remedies it may have at its disposal, NPC herewith responds to the items listed by Captain Rave as conditions for a temporary certificate of occupancy. It is important to note that much of the information contained herein was submitted by NPC in a letter from NPC President William Carden to Captain Rave dated September 15, 2006. No reply has been received. That letter is supplemented by the information herein.

NPC responds in serial fashion to the items outlined in Captain Rave's letter of September 27, 2006:

1. This item addresses the so-called "Area B" considered by the fire department to be a high hazard area. We disagree but will attempt to deal with that designation under protest. NPC's plan is to build a new fire rated wall to contain the grinder within "Area A" which is without question a high hazard area. The issue of protection for the corkscrew conveyor will be dealt with by a flooding mechanism directed at the conveyor and/or a listed damper. This will be accomplished within 90 days.

2. The detailed drawing stamped by a RI Engineer will be completed within 14 days. It is our understanding that the City's consultant, Larry Wenzel as already been in communication with the representative of Grecon, the dust collection system manufacturer.

3. Sprinkler fire alarm and electrical designs have already been submitted or will be submitted by October 2206. The electrical inspector visited the premises on September 25, 2006 and has indicated that the present electrical installation is satisfactory.

4. The new fire alarm will be operational within 14 days.

5. The electrical systems have been inspected, as indicated above. Further we understand that Mr. Wenzel has approved dust proof electrical junction boxes for use.

6. There are existing exit signs and emergency lighting in the premises. These will be upgraded to code within 30 days.

7. Fire extinguishers shall be located in accord with NFPA 10 within 7 days. These will be 2.5 gallon pressurized water extinguishers in all areas except in the soybean oil storage area which will contain dry extinguishers.

8. Until permanent sprinkler heads can be installed we propose operations in Area A by storage there only of the maximum amount of feedstock that can be protected by the existing system. If Mr. Wenzel could provide what amount of feedstock can be accommodated we will act accordingly. In the meantime, Karl Bissex is going to calculate the optimum amount of feedstock that NPC would like to store in Area A. We would also appreciate Mr. Wenzel's calculation of the proper sprinkler to accommodate that amount. We would like to complete these calculations within 7 days and to complete final sprinkler installation within 60 days or sooner.

9-11. NPC will reduce the amount of soybean on the premises to four totes, one for each machine. The existing sprinkler system will be used for suppression and will be supplemented by dry extinguishers in the tote area. Guard posts will also be installed. This will be accomplished within 14 days.

12 The documentation regarding fire barrier sealant will be supplied in 7 days or less.

13. Stopping of fire barrier penetrations will be completed in 14 days. This is mostly completed now. Detail of the penetrations about which Captain Rave would be very helpful.

14. NPC will be seeking a variance regarding an alternate means of protecting fire barriers through which conveyors pass.

15. Perhaps the most problematic issue with which we have dealt is the egress plan. Imminently, Ai Designs will submit a plan of egress that I understand has already been discussed. This plan essentially adopts the "tunnel" approach espoused by Larry Wenzel. Once this plan has been approved NPC will immediately seek contractor bids and will authorize the beginning of construction immediately. This project will be completed within six months of approval of the Ai Design plan.

16. The test and inspection documentation for the existing standpipe will be provided by FSSG within 7 days.

17. The technical sheets for the Bobcat units will be provided within 7 days.

18. The requested time projects are contained in this letter.

There are two final items to be addressed.

The first relates to Captain Rave's contention that operations should be limited to two shirts during the temporary certificate of occupancy period in order to prevent a high hazard area and to accommodate construction. We do not see that the type of construction to be undertaken to implement the egress plan will in any way add to hazard. And, we believe that construction can be accommodated with existing operations.

The second relates to the requirement that a detail firefighter be on premises during all production periods during the temporary certificate of occupancy period. By my calculations this could cost as much as $5400 per week given full operation. Given the major additional expenses created by added code requirements this is an expenses NPC simply cannot absorb. We propose two alternatives. The first is that NPC would pay for one hour of detail firefighter time per production day for a daily inspection of our premises. This could be done at random times. The second is that NPC would establish a connection to fire headquarters of the CCTV system within the plant. This could be done, we believe, via internet.

In conclusion, it is of utmost urgency that NPC gets into operation. NPC needs a temporary certificate of occupancy immediately and proposes the plan contained herein toward that end. NPC requests an expeditious response to the proposals herein, including egress plan review.

We do not wish this process to be contentious. We request your cooperation and pledge ours.

Sincerely,

Lee Blais
Attorney at Law