# Exhibit H

# EAST PROVIDENCE
# FIRE DEPARTMENT

*Division of Fire Prevention*
913 Broadway
East Providence, RI 02914
Phone (401) 435-7682 FAX: (401) 435-5166


William S. Carden
P.O. Box 16087
275 Ferris Avenue
Rumford, RI 02916

September 27, 2006

Dear Mr. Carden,

I am in receipt of your e-mail dated Thursday September 23, 2006. In your e-mail, you outlined the events regarding NPC that occurred before I became the Fire Marshal for the City of East Providence. I appreciate you bringing me up to date.

You refer to approvals and a building permit that was issued to you on the application date of 5/23/06. This is the date that the Fire Department received your second set of plans. I do not know why you would have received the building permit on the same day that you submitted your plans to the Fire Department for review. My first day in the Fire Marshal's Office was July 24, 2006; we met on August 1, 2006. As I have informed you since our first meeting on August 1, 2006, the Fire Department has not given approval to this project. We did not sign the building permit that is on file with the building official. After speaking with the former Fire Marshal and reviewing the building permit, it is clear to me that the East Providence Fire Department never gave approval to this project. As you can see from RI State Law, plans and specifications must have prior approval from the Fire Department.

**§ 23-27.3-113.5 Plans and specifications.** – The application for the permit shall be accompanied by not less than three (3) copies of specifications and plans drawn to scale, with sufficient clarity and detail dimensions to show the nature and character of the work to be performed. The plans and specifications **shall have prior approval** in accordance with the Fire Safety Code, chapters 28.1 – 28.39 of this title. When quality of materials is essential for conformity to this code, specific information shall be given to establish such quality; and in no case shall the code be cited or term "legal" or its equivalent be used as a substitute for specific information. The building official may waive the requirement for filing plans when the work involved is of a minor nature.

§ 23-27.3-115.1 **Compliance with code.** – The permit shall be a license to proceed with the work and shall not be constructed as authority to violate, cancel, or set aside any provisions of this code, except as specifically stipulated by modification or legally granted variation in accordance with §§ 23-27.3-127.1 – 23-27.3-127.2.6.

A major reason that this plan review and approval process is taking so long is the lack of accurate information being supplied to the Fire Department by NPC. The plans that were submitted to the Fire Department around April 14, 2006 were nothing more than a two-page floor plan with no detail at all. The plans submitted on May 23, 2006 were slightly better than the first submittals, but still lacking in detail. I can only assume that someone must have indicated that the first set of prints submitted needed more detail, otherwise why would a second set be submitted on May 23, 2006? I believe that at one of your meetings with the former Fire Marshal, he raised the issues of combustible dust concerns and maximum travel distances being exceeded.

A few days after meeting with you and your representatives at the plant on August 1, 2006, I reviewed the plans that you submitted to us on 5-23-06. I rejected these plans and returned to you a three-page list of code deficiencies. I also tried to return the prints to you, however your attorney advised you not to accept them. Since this time, you have known exactly what the Rhode Island Fire Safety Code requirements entailed for the type of operation that NPC will conduct.

You did not feel that those requirements should apply to your operation. You told me to look at other pellet plant operations, namely New England Pellet, because your operation would be a very similar operation to theirs, so I did. I contacted the local Fire Chief and he confirmed my thoughts about the pellet manufacturing operation being very dusty. He even told me of fires and one explosion at the plant, occurring in the pellet machines and the cooling room. After I explained the results of my looking into New England Pellet to you, you told us all that your operation would be nothing like their operation.

You then agreed to hire a third party independent review to look at your process. The RI Fire Safety Code allows the third party review so that an AHJ can get in-depth technical assistance on complicated issues. I chose Hughes Associates and you agreed to hire them.

After about a two week time period, you submitted another set of prints for me to review. This set of prints included what were supposed to be the manufacturers' specifications for all of the equipment used in your manufacturing process and dust-collection system. I specifically explained the features that I needed to see in the detail, yet what I received amounted to nothing more than generic owner's manuals, parts lists, price quotes, MSDS sheets and installation manuals. I submitted a complete set of everything that you gave me to Hughes Associates so that they could review them. Shortly thereafter, Hughes Associates returned a very thorough report based on their review of your submittals. Lee Blais contacted me immediately to let me know that you were disagreeing with what the third party review had concluded in its report.

I was then told by Lee Blais, via e-mail, to rearrange my schedule and the schedules of the other city representatives, not to mention that of Hughes Associates, to get you a quick meeting. We obliged you and met again on September 11, 2006 to discuss the report and deficiencies. It was during this meeting that we discovered "Area A" full of the raw materials that were previously in the railcars. You had asked my permission to use this material and I replied to you in writing that I would not approve the use that specific raw material. This material was brought into the building anyway. Shortly before this meeting, On September 8, 2006, I rejected your submittals a second time and Donna Harker came to pick them up from my office. Those submittals were accompanied by a three-page deficiency report indicating the reasons why your plans and submittals were not approved. Most of the deficiencies were the same deficiencies listed on the first rejection letter.

You gave me some additional "cut sheets" when I met you briefly on Friday September 15, 2006, before your "Grand Opening-Open House". The Information on the 3M Fire Barrier is not the correct information. You have given me the MSDS information for the product. Please refer to the list below for details. The Reliance Electric Motors information indicates that the motor is suitable for Division II atmospheres. Where is this motor used? Is this the only motor type used for the entire process?

Nowhere on any of your prints have you indicated the size or number of 2000 lb. soybean oil totes that will be used with the pellet machines. All along you have been talking about adding "a little vegetable oil now and then" to the process. I think soybean oil usage in the volume that you will have in the plant deserves an indication of such on the floor plan at least, not to mention on the detail of the machinery layout. Class IIIB combustible liquid of this volume requires certain protection.

This is how the project has been thus far. The fire department gets to see the puzzle one piece at a time instead of the entire picture. This is why you have delays. Please save all of your technical information to be submitted at the time when you submit your revised prints. This will lessen the possibility of some information getting lost.

You have referred to obtaining a temporary Certificate of Occupancy on a few different occasions. In order for a temporary certificate of occupancy to be issued the fire protection and life safety features required of an occupancy must be operational and at a level that the AHJ finds acceptable.

The issues of fire protection and life safety should not be taken lightly. You have asked in the past if there is anyway to relax the fire code, maybe not look at it so strictly. You refer to the regulations and number of "entanglements" as a reason for manufacturing being moved out of the USA, however, there are very good reasons for these "entanglements". Each and every fire code is a direct result of a past tragedy. Hundreds of lives have been lost through our history because someone somewhere ignored existing fire codes. Each tragic loss of life brings about new, more restrictive fire codes. As the years go by and life goes on, those tragic losses become very distant and placed out of our thoughts. This is when the regulations start to seem ridiculous at times and seemingly

become obstacles that need to be circumvented. This is when history has a danger of repeating itself.

Please review the following list of Items. These Items must be in place in order for a temporary Certificate of Occupancy to be considered.

1. The East Providence Fire Department recognizes your effort to contract with a private housekeeping company to try to minimize accumulations of combustible dust in your facility. However, the East Providence Fire Department does not approve of entering into a long term monitoring / inspection process to ensure that you maintain such vigilance with regard to combustible dust accumulation. This would be an inspection process that would need to continue for the lifetime of NPC. There is always a margin for human error in this type of arrangement. Therefore, the East Providence Fire Department is considering "Area B" a high hazard area due to the potential for combustible dust accumulations. This classification was also given to "Area B" in the report by the third party review. "Area B" contains "a particulate size reduction" piece of equipment, which is required by NFPA 664 to be in a Class II Division II area. You have offered to enclose this piece of equipment with a new 2-hour fire barrier and incorporate it into "Area A". This would create yet another 2-hour fire barrier that contains penetrations from dust collection ductwork and a conveyor system that cannot be protected with listed fire dampers, due to the nature of the manufacturing process. NFPA 664 states that a fire barrier should not be penetrated by ductwork used to convey combustible materials. Fire dampers cannot provide reliable operation over the lifetime of the facility, due to wood waste clogging the dampers, rendering them inoperative. We will not approve penetrations in this 2-hour fire barrier if they cannot be protected with listed dampers. We need you to give us a reasonable time period for you to bring this section of the building into compliance with the requirements of a high hazard industrial occupancy.

2. A detailed drawing of the dust collection system, relating to explosion construction or venting of ductwork and dust collector. The suppression system detail should also be included. This design must be stamped by a RI registered Professional Engineer.

3. A complete set of submittals that can be reviewed and approved by the Fire Marshal, including upgraded sprinkler system design, fire alarm and electrical designs appropriate to the occupancy classification.

4. The new fire alarm needs to be 100 % operational and acceptance tested in the NPC section of the building.

5. The electrical systems and system components in must be in accordance with Article 502 or 503 of NFPA 70, National Electrical Code.

6. Exit signs and emergency lighting shall be installed.

7. Fire extinguishers shall be located in accordance with NFPA 10.

8. I received the existing sprinkler system calculations from FSSG. The submitted data states that you will be replacing existing heads with K-factor 8.0 heads. It does not give sprinkler identification numbers for the heads; Therefore, we cannot determine if the heads are listed for the application of an extra hazard area. The calculations need to show that a flow at the specified density is attainable. FSSG needs to tell me how much material can be kept in "Area A" and adequately protected by the existing sprinkler design. This will also apply to the amount of finished product to be stored on pallets in the finished product area. Hughes Associates will confirm the results of any such calculations. The size of these piles will be marked off as to spacing, diameter and height.

9. A design for the protection of the soybean oil totes needs to be submitted and approved. This protection system must also be in place and operational. The level of sprinkler protection must meet that outlined in RIUFC (NFPA 1) Table 66.4.8.2(i). If this cannot be accomplished, an alternative suppression system of dry chemical, CO2, or foam as outlined in the MSDS information that you supplied to me. Guard posts required by RIUFC 60.1.16.1 & 60.1.16.2 need to be installed to protect the totes.

10. Footnote (b) of table 66.4.8.2(i) RIUFC chapter 66 requires the soybean totes to be subjected to a standardized fire test and to be listed and labeled as such.

11. If the suppression system to protect the soybean oil is anything other than the sprinkler system, a mechanical permit is required and the suppression system must be reviewed by the Fire Department for approval.

12. The 3M fire barrier sealant is only effective when it is used as tested to achieve its listed fire rating. You need to supply me with the UL listed assembly that was used for your application of the product. You should have gotten this from the product manufacturer before you used the product to be sure that you used it in a manner in which it was tested. I need something in writing from the person that applied the sealant that indicates they applied it in a manner consistent with the manufacturers' specifications. You have given me information on Tremstop IA as well. This information was also limited to MSDS. If you also used the Tremstop IA, I need to see its UL listed use as well, and a written statement from the installer.

13. All penetrations in all of the fire barriers must be fire stopped. As of my last visit several penetrations were still in the fire barriers and had not been fire stopped. I am not referring to the areas penetrated by the conveyor system.

14. If you are seeking an alternative way of protecting the fire barriers where the conveyor system passes through, you need to seek a variance from the RI Fire

Safety Code Board of Appeal and Review to use something other than a listed damper.

15. The plan and construction for egress that will reduce travel distances to within the 75' maximum travel distance. At least some portion of this need to be in place. A nine-month completion date for means of egress construction is not acceptable

16. Existing Standpipe need test and inspection documentation.

17. Technical sheets for the "Bobcats" and other powered industrial trucks to be used in the high hazard area. These sheets should indicate that the industrial trucks are suitable to use in a combustible dust atmosphere.

18. A timeline for completion of all deficiencies shall be presented. The deadlines must be met and progress to completion must be shown. Completion dates for sprinkler system upgrading, electrical system upgrading and means of egress should be presented.

During the period covered by the temporary Certificate of Occupancy the scope of operations will be limited, so as not to create a high hazard atmosphere. The hours of operation should be limited to 1st and 2nd shifts only, so as to allow construction work to be done in the off hours. The Fire Department will require the hiring of a detail firefighter to be present during the two work shifts to ensure that the raw materials and palletized storage amounts are not exceeded in predetermined areas. This would also ensure that egress routes are kept open.

It should be noted that the RI State Fire Marshal's Office has been informed of the situation at NPC and is in full support of the East Providence Fire Marshal's Office.

Sincerely,

Captain David Rave

Captain David Rave, ADSFM