**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NARRAGANSETT PELLET CORP.** | : | |
| | : | |
| | : | |
| **VS.** | : | |
| | : | **C.A. No. 06-464** |
| | : | |
| **CITY OF EAST PROVIDENCE, through its Treasurer, KEVIN FITZGERALD; ALBERT QUATTRUCCI, individually and in his capacity as Building Official of the City of East Providence; JOSEPH J. KLUCZNIK, individually and in his capacity as Fire Chief of the City of East Providence, and DAVID RAVE, individually and in his capacities as Captain, East Providence Fire Department, East Providence Fire Marshal and Deputy State Fire Marshal; W. KEITH BURLINGAME, individually; CURTIS R. WISE, individually and in his capacity as Captain, East Providence Fire Marshal, East Providence Fire Marshal and Deputy State Fire Marshal; ROBERT POWERS, individually and in his capacity as Fire Alarm Inspector, City of East Providence** | : | |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, and hereby objects to Defendants' Motion for Summary Judgment. In support of said Objection, Plaintiff relies upon its Memorandum, attached hereto and made a part hereof.

Narragansett Pellet Corp.
By its attorneys,

/s/ Stephen M. Robinson
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
June 15, 2007

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
June 15, 2007

**CERTIFICATION**

I, the undersigned, hereby certify that on June 15, 2007 I sent a true copy of the within by electronic service to all of the parties below:

Timothy Chapman, Esq.
Office of the City Solicitor
City Hall
145 Taunton Avenue
East Providence, RI 02914

James Lee, Esq.
Department of the Attorney General
150 South Main Street
Providence, RI 02903

Marc DeSisto, Esq.
2 Angell Street
P.O. Box 2563
Providence, RI 02906

/s/ Vicki J. Bejma

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **NARRAGANSETT PELLET CORP.** | : | |
| **VS.** | : | **C.A. No. 06-464** |
| **CITY OF EAST PROVIDENCE, through its Treasurer, KEVIN FITZGERALD; ALBERT QUATTRUCCI, individually and in his capacity as Building Official of the City of East Providence; JOSEPH J. KLUCZNIK, individually and in his capacity as Fire Chief of the City of East Providence, and DAVID RAVE, individually and in his capacities as Captain, East Providence Fire Department, East Providence Fire Marshal and Deputy State Fire Marshal; W. KEITH BURLINGAME, individually; CURTIS R. WISE, individually and in his capacity as Captain, East Providence Fire Marshal, East Providence Fire Marshal and Deputy State Fire Marshal; ROBERT POWERS, individually and in his capacity as Fire Alarm Inspector, City of East Providence** | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter comes before this Court on Defendants' Motion for Summary Judgment. This matter initially came before this Court in October, 2006 on a Motion for Temporary Restraining Order. That Motion sought the issuance of a Temporary Certificate of Occupancy for Plaintiff's business premises located at 275 Ferris Avenue. As set out in the Plaintiff's Complaint, various officials of the City of East Providence had wrongfully interfered with Plaintiff's economic advantages, and violated state law and the Due Process Clause of the Fourteenth Amendment when, without due process of law, they deprived Narragansett Pellet Corp. (hereinafter, "Narragansett," or "NPC") of its property interest in its previously-issued

Building Permit and expectation of issuance of a Certificate of Occupancy. As was also set out in Narragansett's Complaint, after the issuance of the Building Permit, the City officials, chiefly Defendant City Fire Marshal David Rave, imposed an endlessly-increasing set of additional conditions upon the issuance of Narragansett's Certificate of Occupancy. Defendant Rave imposed these conditions despite the fact that under Rhode Island law, the City Fire Marshal's authority begins and ends once he or she approves the plans submitted in connection with the application for the Building Permit. Furthermore, under Rhode Island law, once a building permit is issued, the Plaintiff has a clear right to a Certificate of Occupancy once the approved construction is completed.

The additional conditions demanded by Defendant Rave threatened to cost Narragansett hundreds of thousands of dollars in unanticipated construction work, as well as substantial delays in beginning business operations. After several months of attempts at negotiation and compliance, these efforts yielded nothing but further conditions and even more blatantly obstructive behavior. Narragansett finally sought injunctive relief in Providence County Superior Court. Moments before hearing in Superior Court, Narragansett was notified of the removal to this Court. Hearing was scheduled before this Court for November 9, 2006.

Before that hearing could be held, Narragansett made one final attempt at resolving this matter. Although Narragansett reserved its rights to relief before this Court, Narragansett did consent to enter into further negotiations, culminating in a Decision from the State Fire Safety Code Board of Appeal and Review. That hearing process resulted in a Board Decision dated November 3, 2006. That Decision called for a series of Temporary Certificates of Occupancy that would allow Narragansett an increasing scope of operations, provided that certain conditions were met.

Narragansett, believing that it may have found relief, withdrew its motions for injunctive relief. Unfortunately, not even going before the Board ensured Narragansett relief from unlawful interference with its interests. Although Narragansett succeeded in obtaining some Temporary Certificates of Occupancy that allowed some limited production, the City Defendants, particularly Defendant Rave, reverted to their earlier course of obstructive conduct.

A Rule 16 Conference was held on or about February 8, 2007. That conference resulted in a Scheduling Order allowing Plaintiff to amend its complaint within 30 days. The Scheduling Order also provided that the Defendants would have 60 days to file a Motion for Summary Judgment. In the interim, discovery would be stayed.

The Plaintiff has duly filed its Second Verified Amended Complaint, which added additional counts, including some covering the City Defendants' behavior since the Board decision. The City Defendants now come to this Court seeking summary disposition of all of the counts contained in Plaintiff's Second Verified Amended Complaint. For the reasons we shall discuss below, the Plaintiff has sustainable causes of action against the City Defendants, and should be permitted to proceed.

## II. FACTS

### A. Pre-Litigation Interference with Occupancy

Narragansett's current odyssey through the permitting process first began in late 2005, when Plaintiff's President and incorporator, William Carden, first developed the concept for Narragansett, that of manufacturing wood pellets. These wood pellets are manufactured from clean, processed wood that, if not recycled, would otherwise have been put in landfills. These pellets are used in so-called "pellet stoves" for home heating purposes and cogeneration plants as an alternative to other energy sources, such as oil. (See Affidavit of William Carden, Ex. 1, ¶ 1.)

Mr. Carden first contemplated locating in East Providence when he learned of the premises at 275 Ferris Avenue. The 275 Ferris Avenue, East Providence premises appeared to be uniquely well-suited for the operations contemplated by Narragansett due to the fact that the premises already had silos for storage, ample power supplies and space, loading docks, and a railway platform, all of which were essential to accommodate pellet manufacture. (Second Verified Amended Complaint, ¶ 12.) Mr. Carden accordingly began to further investigate the suitability of the 275 Ferris Avenue as a base of operations.

While the amenities of 275 Ferris Avenue were quite attractive, fire and life safety code compliance was also a paramount concern for Mr. Carden. One of the first steps that Mr. Carden took when investigating the suitability of 275 Ferris Avenue was to visit the City's former Fire Marshal, Captain Curtis R. Wise, to discuss what steps would be necessary to bring that premises into compliance. Captain Wise advised Mr. Carden to obtain the services of an architect to ensure compliance. Captain Wise even recommended such an architect, Dana Newbrook, President of ai Design Ltd. (Ex. 1, ¶ 2.) By February, 2006, Mr. Carden had completed the process of creating Narragansett Pellet Corp., and retained Mr. Newbrook and ai Design Ltd. (Ex. 1, ¶ 3.) Mr. Carden had relied upon Captain Wise's recommendation and Mr. Newbrook's apparent expertise with and fire and life safety code issues. Narragansett was never informed of the fact that Mr. Newbrook was a member of the Fire Safety Code Board of Review and Appeal, and did in fact exercise regulatory and supervisory jurisdiction over Captain Wise. (Ex. 1, ¶ 2.)

For next several months, Narragansett appeared to be cementing a successful and mutually beneficial relationship with the City of East Providence. The day after Narragansett began its corporate existence, that is, on January 31, 2006, Narragansett's officials met with the City's Zoning Officer and Planning Director, and provided a description of Narragansett's

planned manufacturing process. (Ex. 1, ¶ 4; Ex. 2.) Zoning and planning approval duly came on or about February 10, 2006. (Ex. 1, ¶ 5.) The City appeared to welcome Narragansett's arrival; the East Providence Economic Development Commission gave financing of approximately $99,000. (Ex. 1, ¶ 6.) On or about April 10, 2006, Narragansett entered into a ten-year lease for the 275 Ferris Avenue premises, and began the process of obtaining appropriate permits. (Ex. 1, ¶ 7.) Narragansett submitted its first application for building permit and plan review. (Ex. 4.) Narragansett maintained communications with Fire Marshal Wise and City Fire Alarm Inspector Robert Powers regarding compliance issues, further discussing their business operations at a meeting on May 8, 2006. (Ex. 1, ¶ 8; Ex. 3.) Plaintiff subsequently submitted another application for a building permit and plan review. (Ex. 5.) On or about May 23, 2006, the City, through its Building Official, Albert Quattrucci, issued Building Permit A3168, approving the Narragansett's construction plans. (Ex. 6.) The plans submitted with the application were in fact stamped "approved for construction." (Ex. 7.)

Narragansett began construction in accordance with its permit, as well as other preparations for the commencement of business operations. (Ex. 1, ¶ 9.) After issuance of the permit, Narragansett also entered into agreements for the provision of raw materials and railway cars, and also sales contracts for finished wood pellets. (Ex. 1, ¶ 10-11.) By late July, Narragansett had completed most of the approved work, and was poised to begin operations within a matter of weeks. (Ex. 1, ¶ 12.) Narragansett had in fact requested a temporary certificate of occupancy, believing it to have substantially completed the approved construction. (Ex. 1, ¶ 13.) Narragansett received an e-mail from Defendant Powers, indicating that the request for a temporary certificate of occupancy would be reviewed. (Ex. 1, ¶ 14; Ex. 8.)

At that point, the newly-appointed City Fire Marshal, David Rave, along with the City Fire Alarm Inspector Robert Powers, began a course of unlawful intervention in this process. Defendants Rave and Powers came to the Plaintiff's plant on August 1, 2006. During that visit, Defendant Rave told Narragansett officials that Narragansett's building permit was invalid. Also during that visit, Defendants Rave and Powers told Narragansett that its entire premises should be classified as a High Hazard area under the applicable fire and life safety codes. (Ex. 1, ¶ 16-19) Defendant Powers made these assertions despite the fact that he had participated in the May 8, 2006 meeting regarding compliance issues, and should have been well aware of the manufacturing process before this. That change in classification would involve hundreds of thousands of additional construction work that had not been anticipated when start-up costs were calculated. (Ex. 1, ¶ 22.)

The August 1, 2006 visit to the Plaintiff's plant was followed by another a week later, on August 8, 2006. At that meeting, Defendant Powers echoed Defendant Rave's earlier assertion that the building permit was invalid, and raised concerns about the raw materials -- again, despite the fact that he had participated in the May 8, 2007 meeting regarding the manufacturing processes. (Ex. 1, ¶ 21.) Defendant Rave reiterated that Narragansett's entire premises should be classified as High Hazard Industrial, taking the position that this classification was warranted because some of the raw materials used by Narragansett constituted "wood dust" under the applicable codes. (Ex. 1, ¶ 22.) Defendant Rave presented Narragansett's officials with a "deficiency list." (Ex. 1, ¶ 20; Ex. 9.) Defendant Rave also indicated that he would let Narragansett know whether the State Fire Marshal would be involved in a review of new plans, or whether he would arrange for a third party review. (Ex. 1, ¶ 24.) Later that day, by telephone, Mr. Carden indicated to Defendant Rave that he would be willing to change his raw material

specifications so as to obviate the need for “wood dust.” Defendant Rave indicated that if Mr. Carden made that change, he could have his Temporary Certificate of Occupancy issued the next week. (Ex. 1, ¶ 25.)

Mr. Carden immediately changed the specifications for raw material. (Ex. 1, ¶ 25; Ex. 10.) Nevertheless, he still received no Temporary Certificate of Occupancy. Instead, Defendant Rave informed Narragansett that he had decided to have a third party, Hughes Associates, Inc., review Plaintiff’s plant. (Ex. 11, ¶ 2.) Defendant W. Keith Burlingame participated in said review as an employee of Hughes Associates, Inc. – but, like Defendant Newbrook, did not disclose the fact that he was a member of the Fire Code Board of Appeal and Review. (Ex. 1, ¶ 27-28; Ex. 17.) Later, although Narragansett never hired Hughes Associates, it was presented with Hughes Associates’ bill for $14,085.12. (Ex. 1, ¶ 34; Ex. 11, ¶ 3.)

On or about September 6, 2006, Defendant Rave presented Narragansett with another “deficiency list.” This document referenced numerous other matters not referenced on the August 8, 2006 “deficiency list.” (Ex. 12.) Furthermore, this list continued to demand that the entire premises be classified as High Hazard, even though the Hughes report had not taken the position that the entire premises needed to be classified as such. (Ex. 13.) By this time, Plaintiff, in compliance with Defendant Rave’s instructions, had on August 16, 2006 submitted an application for a new building permit, along with an application for plan review. (Ex. 1, ¶ 26; Ex. 14.) However, on September 8, 2006, Defendant Rave contacted Plaintiff’s Office Manager, Donna Carden-Harker, and told her that he was rejecting those plans, and demanded that she pick them up. He provided no explanation. (Ex. 11, ¶ 4.)

Plaintiff made yet another attempt to comply with Defendant Rave’s demands. Plaintiff met with City fire officials again on September 11, 2006. (Ex. 1, ¶ 31; Ex. 17.) On September

15, 2006, Plaintiff submitted a plan to address the September 6, 2006 "deficiency list." In that plan, Plaintiff agreed that the area in which the raw materials would be stored ("Area A") would be deemed a High Hazard area. Furthermore, a portion of the manufacturing area ("Area B") would be deemed a High Hazard area. That portion would encompass the grinder, which was the piece of machinery that would generate "wood dust." Plaintiff provided other items of information and production specifications demanded in the September 6, 2006 "deficiency list." (Ex. 15.) Also on September 15, 2006, Plaintiff's officials met with Defendant Rave. At that time, Defendant Rave indicated that he would be willing to work with Plaintiffs on arrangements for in-house cleaning to deal with issues of dust accumulations for a thirty-day period. (Ex. 1, ¶ 33.)

Nearly another week went by without response to the September 15, 2006 correspondence. On September 21, 2005, Mr. Carden sent Defendant Rave an e-mail updating him on their progress on the September 6, 2006 "deficiency list," and renewing his request for a Temporary Certificate of Occupancy. (Ex. 16.) Another six days went by before Defendant Rave replied on September 27, 2006, with another list of items that he required before he would consider a Temporary Certificate of Occupancy, as well as demands for further drawings and product specifications and a timeline for completion of all deficiencies. That communication continued to insist that all of Area B be considered a High Hazard area. Additionally, Defendant Rave indicated that even when a Temporary Certificate Occupancy would be issued, Plaintiff could only operate during the 1st and 2nd shifts to allow construction. Defendant Rave also demanded that Plaintiff hire a detail fireman during said shifts. Defendant Rave reneged on considering an in-house cleaning system. Even though under his conditions, a detail fireman

would be present, Defendant Rave still felt that the in-house cleaning system would require too much oversight. (Ex. 18.)

Through its legal counsel, Plaintiff responded to the September 27, 2006 communication two days later, on September 29, 2006. This time, it agreed to consolidate the grinder into Area A. However, Plaintiff disagreed with the proposition that it needed to limit production to the 1st and 2nd shifts during the Temporary Certificate of Occupancy stage, as construction could be done within existing operations without causing a hazard. Plaintiff also disagreed with the proposition that a detail fireman be provided for both shifts. Instead, Plaintiff proposed to pay for one hour of detail firefighter time for random inspections, or to establish a connection between the Fire Department and Plaintiff's closed circuit television system. (Ex. 19.)

On October 4, 2006, Plaintiff attempted to supplement its September 29, 2006 correspondence with another update. This packet included an updated egress plan that Defendant Rave had required. (Ex. 11, ¶ 5; Ex. 20.) When Ms. Carden-Harker attempted to submit this supplement, the Fire Department personnel turned her away, on the grounds that the appropriate person was not available. (Ex. 11, ¶ 6.) The next day, October 5, 2006, Ms. Carden-Harker returned to the Fire Department. This time, she was permitted to submit her materials. (Ex. 11, ¶ 6-7.) However, even having gone through this irksome set of procedures, the Plaintiff's efforts were still doomed to failure. By letter dated October 4, 2006, Defendant Rave changed his course. While he had previously asserted authority to approve Certificates of Occupancy and/or Temporary Certificates of Occupancy, his October 4, 2006 letter indicated that these approvals were beyond his authority; Plaintiffs must instead turn to the State Fire Marshal and/or Fire Safety Code Board of Appeal and Review. Furthermore, Defendant Rave indicated that before he would recommend issuance of a Temporary Certificate of Occupancy, he

would require compliance with the items cited in the September 27, 2006 letter. Defendant Rave asserted that his demands were "non-negotiable." Finally, Defendant Rave requested that further correspondence by conducted by certified mail. (Ex. 21.)

By this time, Plaintiff had long since completed all of the work required under its original Building Permit A31628. (Ex. 1, ¶ 35.) Accordingly, on October 6, 2006, Narragansett requested a Certificate of Occupancy from the Building Official, Defendant Albert Quattrucci – the official statutorily empowered to grant that Certificate of Occupancy. (Ex. 22.) In the meantime, on October 10, 2006, Ms. Carden-Harker attempted to submit further updates to Defendant Rave and Defendant Quattrucci. However, the Fire Department's secretary refused to accept Ms. Carden-Harker's submission, stating that the Plaintiff needed to submit a new application for a building permit, along with a complete set of plans. Ms. Carden-Harker attempted to explain to Captain Rave that her submissions were in response to his September 27, 2006 list, rather than an application for a building permit. However, Captain Rave remained obdurate in his refusal to accept her submission without a new application and set of plans. Finally, Plaintiff submitted a new application for a building permit, explaining that this application only supplemented Building Permit A31628. (Ex. 11, ¶ 8-13; Ex. 23-23a) On that same date, Defendant Rave refused to accept Ms. Carden-Harker's delivery of fire alarm plans, asserting that they needed to be submitted by a licensed electrician. (Ex. 11, ¶ 14.) Interestingly enough, on that same day, Mr. Quattrucci also informed Mr. Carden and Ms. Carden-Harker that the Fire Marshal had in fact verbally approved the plans submitted with the Building Permit issued on May 23, 2006, and that such verbal approvals had been the standard practice for some time. (Ex. 1, ¶ 36; Ex. 11, ¶ 15.)

Defendant Rave's further actions that week were even more obstructive. On October 10, 2006, Plaintiff was testing one of its grinders as part of the testing and installation process when it began smoldering. Plaintiff's employees used their fire extinguishers and hoses and quickly brought that smoldering under control. With Narragansett's fire alarm system, the use of the fire hose triggered an alarm at the Fire Department. Defendant Rave responded to that alarm. (Ex. 24, ¶ 2.) However, the very next day, on October 11, 2006, Narragansett was told by its landlord that it must remove the fire hose from Plaintiff's premises, on Captain Rave's instructions. (Ex. 24, ¶ 4.) Defendant Rave completed that day's work by rejecting a submission from Plaintiff's architect. (Ex. 1, ¶ 38.) Also on that date, Building Official Quattrucci issued a Cease and Desist Order, forbidding Plaintiff to begin manufacturing operations until a Certificate of Occupancy was issued. This Cease and Desist Order was given to Plaintiff's landlords. (Ex. ¶ 25.) Finally, on October 13, 2006, Defendant Rave sent correspondence to Plaintiff's landlords, forbidding Plaintiff even to engage in testing and construction. Furthermore, Plaintiff was to remove all raw materials from the building within 48 hours. (Ex. 26.)

**B. Post-Litigation Inference with Occupancy**

Defendant Rave's actions in early October, 2006 unequivocally marked the end of any viable options for Narragansett to obtain a Certificate of Occupancy without engaging in litigation. By this time, Narragansett had engaged in two months of discussion with Defendant Rave regarding what precisely he would require before issuing a Temporary Certificate of Occupancy. Narragansett had made repeated attempts to comply with his "moving target" demands. By October 13, 2006, Defendant Rave would not permit Narragansett to continue their construction, and would not even accept submissions. Additionally, despite holding himself out as the authority empowered to approve Certificates of Occupancy (Ex. 18), Defendant Rave

declared that he lacked such authority once Narragansett's legal counsel made a request for a temporary certificate of occupancy. (Ex. 21.) The Building Official – the official who in fact was statutorily authorized to issue Certificates of Occupancy (temporary or otherwise) – was apparently acquiescing in Defendant Rave's usurpation of his role, only intervening to issue the October 11, 2006 Cease and Desist Order. At that point, Narragansett could not even engage in construction or installation.

Narragansett then turned to the Superior Court for injunctive relief. After the matter was removed to this Court, Plaintiff agreed to make one final chance at resolving this matter by way of negotiations. The November 3, 2006 Decision of the Board is the fruit of those discussions, and represents a sort of "Consent Order" by the parties. (Ex. 27.) However, the success of a consent order in resolving a dispute must ultimately rest upon the good faith of the parties entering into it. As the post-litigation history of this matter demonstrates, the City Defendants apparently had no such good faith.

After receiving the November 3, 2006 Decision, the Plaintiff along with its consultants immediately began completing the steps that would allow them to complete the Phases of the Decision that would allow them to obtain the Temporary Certificates of Occupancy that would permit them to operate. Unfortunately, these efforts continued to be frustrated by irksome procedures and obstructive behavior. When Narragansett attempted to submit materials required to enter the first Phase of the Decision, which would grant them a three-day temporary certificate of occupancy, the Fire Department and Defendant Rave initially refused to accept those materials when dropped off by Ms. Carden-Harker, causing a delay. (Ex. 11, ¶ 16-19, Ex. 28.) Later, Assistant City Solicitor Chapman would try to establish as a "ground rule" that only Narragansett's consultants were to be allowed to drop off said materials – despite the fact that

requiring physical delivery by those consultants would be a very expensive type of courier delivery. (Ex. 28.)

On November 21, 2006, Defendant Powers returned to the plant. At that time, he told Plaintiff's Plant Manager that the schedule for issuance of a Certificate of Occupancy would be accelerated. Defendant Powers indicated that after the air system and steam system were approved by Plaintiff's consultants, and Plaintiff obtained drawings and a mechanical permit for the dust/steam systems along with a "timeline" letter, Plaintiff could expect to receive a one-year Temporary Certificate of Occupancy that would allow full production while completing the fire suppression work. (See Ex. 29, ¶ 5-9.)

Narragansett's relief was short-lived. By December 1, 2006, Plaintiffs had achieved Phase II of the plan set out by the Decision, which granted a two-week Temporary Certificate of Occupancy, allowing them to run two pellet mills for one 8-hour shift. However, on December 6, 2007, Mr. Carden was informed that plans that had been previously submitted had to be re-submitted. (Ex. 1, ¶ 40.) When Mr. Carden called Defendant Powers the next day to discuss this matter, Defendant Powers denied that he had ever indicated that the Certificate of Occupancy would be accelerated. (Ex. 1, ¶ 40.) Later, the day before the two-week Certificate of Occupancy was to run out, Defendant Powers insisted upon the performance of additional work over and beyond what was required by the Decision as a condition of permitting Narragansett to enter into Phase III. On or about December 13, 2006, Defendant Powers indicated that the fire alarm upgrades must be installed before Plaintiff received their Phase III Temporary Certificate of Occupancy, which would last five weeks. Defendant Powers imposed this condition despite the fact that the Decision made no reference to these fire alarm upgrades as a condition of proceeding to Phase III. Defendant Rave authorized a three-day extension of the Phase II

Temporary Certificate of Occupancy. However, Defendant Powers' requirement could not be fulfilled on such short notice, leaving Plaintiffs non-operational by December 18, 2006 once more. (Ex. 1, ¶ 42-44.)

By January 2, 2007, Narragansett had installed the additional fire alarm upgrades demanded by Defendant Powers, and received their Phase III Temporary Certificate of Occupancy. (Ex. 1, ¶ 45.) Admittedly, Defendant Rave did permit operations beyond that which were originally contemplated by the Decision, permitting Narragansett to operate four pellet mills, two shifts a day, rather than the two mills one shift a day as outlined by the Decision. (Ex. 1, ¶ 46.) However, as a condition, Narragansett was required to have its consultants present during operations, which had not been required in Phase III – a considerable expense. (Ex. 1, ¶ 46.)

In any case, the question of what was necessary to achieve a Certificate of Occupancy was still a moving target. On at least one occasion, Defendant Rave has demanded that Plaintiff perform a task to one set of specifications, only to return and impose another set of specifications. For example, Plaintiff was informed by its consultant that Defendant Rave had demanded that a pile of raw material be moved to one location. Once that was done, Defendant Rave then demanded that that same pile be moved elsewhere. (Ex. 1, ¶ 47; Ex. 24, ¶ 7.)

Even more significantly, in order to complete the work that was required of Narragansett in order to obtain a Certificate of Occupancy, Narragansett required additional financing. This need for additional financing, of course, was a function of the fact that Narragansett was substantially delayed in production. As a condition of said financing, Narragansett's potential lenders were requiring that they be provided by correspondence from Defendant Rave verifying what items of work remained outstanding before a Certificate of Occupancy could be issued, and

the time line in which Defendant Rave required them to be completed. In other words, they sought ascertainment of the precise conditions under which Narragansett was to operate before they would invest any more money. Narragansett was also fortunate enough to land a potential contract for $8,000,000 worth of its finished production. This contract, too, would hinge on Narragansett's receipt of ascertainment of the conditions under which it was to operate. (Ex. 1, ¶ 49-50.)

On or about January 9, 2007, Narragansett's consultant e-mailed Defendant Rave with draft correspondence for Defendant Rave's signature. Said e-mail explained that this verification was necessary for financing. By reply e-mail of that same date, Defendant Rave indicated that he would review that draft letter and "get back to" Narragansett's consultant. (Ex. 29.) Over the month of January, Narragansett's consultant communicated with Defendant Rave regarding what further steps need to be taken, and responded to various questions and concerns Defendant Rave had in reference to that letter. (Ex. 30-31.) By letter dated January 26, 2007, Defendant Rave did in fact agree to defer one of the items necessary to proceed to Phase IV, that of constructing the egress corridors, until March, 2007, until Narragansett could obtain necessary financing. (Ex. 32.)

Having engaged in these discussion and negotiations, Defendant Rave, along with other City officials then embarked upon a course of conduct that interfered with Narragansett's ability to obtain financing. By January 31, 2007, Narragansett's consultant forwarded to Defendant Rave what he believed would be a final draft of the letter to Narragansett's lenders, stressing that Narragansett sought to close on financing over the next several days. (Ex. 33.) Defendant Rave's next move in connection with this letter is strikingly like that of his conduct last fall in connection with the issuance of a Temporary Certificate of Occupancy. As we discussed

previously, last fall, he engaged in discussions about what would be necessary to issue a Temporary Certificate of Occupancy – but at the last minute denied that he had authority to approve it. This winter, when first asked for this letter, Defendant Rave raised no question of his authority to provide it, but simply indicated that he would look at it and "get back to" the Plaintiff's consultant. Again, at the eleventh hour, Defendant Rave claimed that he had no authority to issue that letter. Instead, he pointed to another source, the City Solicitor's office. (Second Verified Complaint, ¶ 132 and Answer of City Defendants, ¶ 132.) Efforts to obtain that letter from the City Solicitor's office were singularly unfruitful. Narragansett's counsel contacted Assistant Solicitor Chapman regarding that letter on the morning of February 1, 2007, but was unsuccessful in obtaining said correspondence. (Ex. 34; Ex. 38.)

By early spring, City officials had succeeded in once again placing Narragansett in precisely the same position as it was last fall, that is, one of complete paralysis. Narragansett's Phase III Temporary Certificate of Occupancy was set to expire on or about February 5, 2007. Narragansett had not been able to complete two items necessary to complete Phase III by that time. It was agreed that Narragansett would suspend operations until such time as the work was completed, at which time Defendant Rave would return to the plant for inspection (Ex. 1, ¶ 51-52.) Narragansett succeeded in completing said work on February 9, 2007 and requested an inspection, only to be told by Defendant Rave that he would not be available to inspect the work until February 15, 2007. (Ex. 12, ¶ 21; Ex. 35; Second Amended Complaint, ¶ 139-40 and City Defendants' Answer, ¶ 139.) Narragansett, through its counsel, contacted the Assistant City Solicitor, and indicated that it would assume that the Phase III Temporary Certificate of Occupancy would remain in full force and effect until such time as Defendant Rave was available to perform the inspection. (Ex. 35.) Instead of making this completely reasonable

compromise in light of Defendant Rave's schedule, Defendant Rave directly communicated with Narragansett's landlords, insisting that if Narragansett were to operate, the Fire Department should be contacted immediately. The writing in question would give the distinct impression that Narragansett's operations created an immediate safety hazard. (Ex. 36; Ex. 12, ¶ 21-23.) This communication resulted in counsel for the landlord's threatening legal action against Narragansett. (Ex. 37.)

Ultimately, after appeal to the City Solicitor, William Conley, Defendant Rave agreed to perform the inspection on February 13, 2007, and extend the Phase III Temporary Certificate of Occupancy until March 9, 2007. (Ex. 38.) However, by communication dated February 15, 2007, Defendant Rave once again contacted Narragansett's landlord, indicating that he would not agree to another extension of the Phase III Temporary Certificate of Occupancy unless the egress corridors had at least begun. (Ex. 38.) At the same time, Assistant City Solicitor flatly refused to provide the correspondence that would verify that at some point, Defendant Rave would be satisfied that Narragansett's premises is in compliance with applicable fire and life safety codes. (Ex. 39.) City officials, of course, had been informed that this letter was necessary to obtain the financing that was needed to do the work. Narragansett was thus left in a "Catch-22" situation.

In April, 2007, Narragansett returned to the Fire Safety Code Board of Appeal and Review for approval of a modified plan that would grant it a Temporary Certificate of Occupancy until June 30, 2007. The Board granted an "approval" of that plan – but emphasized that the decision of whether or not to issue the Temporary Certificate of Occupancy remained with the City Building Official. (Ex. 40, p. 7:11-16.) Narragansett was ultimately able to negotiate financing. It obtained Narragansett is currently producing pellets. However, the current Temporary Certificate of Occupancy that permits operations expires in two weeks.

Although Narragansett is confident that it will have completed all construction required by the City, Narragansett still has no assurance of receiving a Certificate of Occupancy.

## III. LEGAL ARGUMENT

Defendants' Motion has at least nominally been characterized as one for summary judgment pursuant to Fed.R.Civ.P. 56(c). If in fact the standard for summary judgment is to be applied here, Defendants face a formidable burden. Defendants must demonstrate that ". . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The reviewing court does not make factual determinations itself, or decide which edition of the facts to accept; it merely determines whether ". . . a fair-minded jury could return a verdict for the plaintiff on the case presented." ***See*** Lipsett v. University of Puerto Rico, 864 F.2d 881, 895 (1st Cir. 1988). The record is reviewed in the light most favorable to the non-moving party. ***See*** Rossy v. Roche Products, Inc., 880 F.2d 621, 623 (1st Cir. 1989). All factual inferences must be drawn in favor of the non-moving party. ***See*** Rossy at 623.

That having been said, the procedural posture of this matter makes it more appropriate to construe Defendants' Motion as one for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). By this Court's Order of February 15, 2007, Defendants were given an opportunity to file this Motion for Summary Judgment. By that same Order, discovery was stayed. It appears to have been contemplated that instead of testing whether the Plaintiff had amassed sufficient evidence in support of its claims, the instant Motion would be geared towards determining whether the Defendants were entitled to some form of immunity. Due to this lack of opportunity for discovery, it is inappropriate to apply the standard for summary judgment. ***See, e.g.,*** Celotex v.

Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, ***after adequate time for discovery*** and upon motion . . ." [emphasis added]). This is particularly so given the general goals of the present Motion. In addition, the Defendants themselves focus their arguments on the sufficiency of the Plaintiff's complaint. Therefore, it is more appropriate to apply the standard for Fed.R.Civ.P. 12(b)(6). ***See*** Gray v. Derderian, 371 F.Supp.2d 98, 102 (D.R.I. 2005) (hereinafter, "***Gray I***").

The standard for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) is even more stringent than that applied when ruling on a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). When ruling on a motion for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), the Court goes no further than testing the sufficiency of the complaint. The complaint is not to be dismissed ". . . unless it appears that beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief. ***See*** Gray v. Derderian, 400 F.Supp.2d 415, 420-42 (D.R.I. 2005) (hereinafter, "***Gray II***"), ***citing*** Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The allegations contained in the complaint are accepted as true, and all reasonable inferences to be drawn from said facts will be construed in the light most favorable to the plaintiff. ***See*** Gray II, ***citing*** Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).

This stringent Rule 12(b)(6) standard is applied with particular strictness in the case of civil rights violations. ***See*** Irish Lesbian and Gay Organization v. Giuliani, 143 F.3d 638, 644 (2nd Cir. 1997). In such cases, the complaint must not be dismissed unless it appears to a certainty that plaintiff would not be entitled to relief under any set of facts alleged in support of its claim. ***See*** Watts v. Graves, 720 F.2d 1416, 1419 (5th Cir. 1983); Scher v. Bd. of Educ. of the Town of West Orange, 424 F.2d 741, 744 (3rd Cir. 1970).

## A. DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF THE EQUITABLE ESTOPPEL COMPLAINT UNDER COUNT XI OF ITS COMPLAINT.

At this juncture, Defendants cannot obtain dismissal of the Plaintiff's claim for equitable estoppel, brought under Count XI of its complaint. Essentially, Plaintiff has asserted that under the theory of estoppel, it was entitled to issuance of a certificate of occupancy once it had completed the construction approved with its original Building Permit, issued in the spring of 2005. Under Rhode Island law, the doctrine of estoppel has been applied to municipalities as well as private individuals. ***See*** Town of Glocester v. Olivo, 300 A.2d 465, 471 (R.I. 1973). Most notably, the doctrine of estoppel has been applied against municipalities who attempt to impose after-the-fact restrictions upon validly issued building permits and/or attempt to revoke them outright.

This legal principle was first established in Rhode Island in the case of Shalvey v. Zoning Bd. of Review of the City of Warwick, 210 A.2d 589 (R.I. 1965). In the case of *Shalvey*, the applicants had received building permits to erect a multi-family dwelling. *Id*. at 693. At the time, the zoning ordinances permitted multi-family dwellings in that particular area. *See id.* at 695. Later, the applicable zoning ordinance was amended to restrict construction to single-family dwellings. *See id*. The Rhode Island Supreme Court specifically held in that case that where an applicant has been issued a valid building permit, and has taken substantial action thereon, the principles of estoppel apply. Once the applicant takes substantial reliance on that permit in good faith, that permit is not subject to revocation – in this case, by amendments to the zoning ordinance. *See id.* at 593. *See also* Tantimonaco v. Zoning Bd. of Review of the Town of Johnston, 218 A.2d 480 (R.I. 1966).

The principles enunciated in *Shalvey* have been applied in situations other than those involving amendments to the zoning ordinance after the issuance of a valid permit. The case of Caprio v. Rizzo, 1981 R.I. Super. LEXIS 61, expanded on *Shalvey* to imply that the right to rely upon permits includes the right to rely upon approvals of plans submitted in connection with a building permit. In *Caprio*, the owners of a certain property were issued a building permit for the purposes of making renovations to their restaurant. *Id*. at *1. It was unquestioned that the work was performed in accordance with the plans submitted and approved. *See id.* After the work was finished, a certificate of occupancy issued. Shortly thereafter, various abutters appealed the issuance of the certificate of occupancy to the local Zoning and Platting Board of Review. *Id.* at *2. The Board reversed the certificate of occupancy, and ordered the Building Inspector not to reissue it until such time as the owners blocked off various portions of the building so that food and liquor could not be served in that area. The Board based its decision on the premise that a restaurant-bar on that particular portion of the restaurant was an illegal expansion of a non-conforming use. *Id*. at *4. On appeal, the *Caprio* Court applied the doctrine of estoppel, holding that the certificate of occupancy must be reinstated forthwith:

> The plaintiffs had a right to rely upon the issuance of the permit. There is a right to appeal the Building Inspector's decision in the issuing of a certificate of occupancy. As to an appeal from the decision from the decision to issue a certificate of occupancy, the right exists to determine if he abuses his authority in determining that there has been compliance with the permit in that the construction as completed is in accordance with the plans and specifications as approved. *Once there is an approval and in full accord with the plans and specifications set forth in the building permit*, the only decision that the Inspector can make is one that is mandated by the Zoning Ordinance. Chap. 246, § 11.2 of the Zoning Ordinance:
>
>> "If the proposed use is in conformity with the provisions of this ordinance, the certificate of occupancy shall be issued within (5) days after the application for the same has been made."

> *The Building Inspector made such a determination that there was compliance with the plans and specifications and was mandated by law to give such a certificate of occupancy.*

*See id.* at 6-7. (Emphases added.) Under *Caprio*, then, the doctrine of estoppel applies to approved plans submitted in conjunction with a validly issued building permit. If the applicant builds in accordance with said plans, then the municipality is estopped from claiming that the plans are not in compliance of the law. Therefore, if the construction is done in accordance with those plans, the applicant must receive a certificate of occupancy.

Defendants attempt to counter this estoppel argument by arguing that even after the fact of approval, the construction still must comply with the applicable codes. However, under *Caprio,* the approval of those plans instead serves as a representation by the municipality that the construction as planned will conform with the law. Once more, as the *Caprio* Court stated: "The plaintiffs had a right to rely upon the issuance of the permit." *Id*. at *6.

The applicant's right to rely upon a permit – as well as the municipality's lack of a right to defeat that right by claiming that a mistake was made by the building official when approving the plans – was in fact explicitly upheld by the Rhode Island Supreme Court in the case of *Jones v. Rommell*, 521 A.2d 543 (R.I. 1987). In *Jones*, the plaintiffs were issued a building permit to convert property from a lumber mill to an inn. *Id.* at 544. Prior to that, the plaintiffs had received approval of a plan for parking to service said inn. The municipal had given that approval after the building official's had reviewed the plan and applied a local parking ordinance. *See id.* On appeal, the local zoning board revoked the building permit, on the grounds that the building official had incorrectly interpreted and applied the formula. *See id*. In this case, although the Supreme Court agreed that the building inspector's application and interpretation of the formula had been incorrect, the principles of estoppel should still apply,

given the substantial expenses incurred by the plaintiffs in good-faith reliance upon the issuance of the building permit. *See id*. at 545-46, *citing* Shalvey.

Similarly, in the recent case of *Kulak v. Charlestown Zoning Bd. of Review*, 2005 WL 1163976 (R.I. Super.), the municipality was not permitted to defeat the principles of estoppel by pointing to an alleged mistake in the process of approving building plans. In *Kulak*, the applicants had obtained a dimensional zoning variance and special use permit in order to permit them to construct a home closer to the property lines than would otherwise have been permitted under the applicable ordinance. *Id*. at *1. Later, the applicants submitted plans to the local building official, and received a building permit. The applicants constructed their home, and received a certificate of occupancy. *See id*. An appeal was filed on the issuance of the certificate of occupancy. As it emerged, there was a discrepancy between the plans approved in connection with the building permit, in that they exceeded the relief granted by the zoning board. *See id*. at *1-2. Despite the fact that the building inspector had not caught the error, the *Kulak* Court still applied the principles of estoppel should apply.

Under the well-established case law in Rhode Island, the Plaintiff's claim of estoppel must survive. Narragansett took all necessary steps to perfect a property interest in its building permit back in the spring of 2006. It submitted its application and plans, and a permit was issued by Building Official Albert Quattrucci. (Exs. 4, 5, 6, 7.) By August 1, 2006, Narragansett had taken substantial actions in reliance upon the building permit that had been issued in May, 2006. It had mostly completed the construction encompassed by the permit. (Ex. 1, ¶ 9.) Narragansett had also taken steps to start its business operations on the expectation of receiving a certificate of occupancy and being permitted to begin business operations, including, but not limited to,

beginning construction and entering into various contracts that it could not fulfill absent authorization to begin manufacturing. (Ex. 1, ¶ 12-13.)

Accordingly, the City officials were estopped from revoking the permit, or revoking the approval of the plans. However, that is precisely what the City officials did. Although the plans had been approved, and a permit issued, Defendants Rave and Powers – with Defendant Quattrucci's acquiescence – effectively revoked that approval. Defendants Rave and Powers made false representations that the permit was invalid. (Ex. 1, ¶ 16-19, 21.) Defendants Rave and Powers also demanded large amounts of additional and different work besides that which had been included in the original plans. (Ex. 1, ¶ 16-19; Ex. 9; Ex. 12.) Because the Building Official had already issued a building permit, however, Defendants Rave and Quattrucci were estopped from taking that course of action.

Defendants have attempted to undermine Plaintiff's right interest in the Building Permit by attacking its validity. Defendants' Memorandum suggests that Captain Wise, who was Fire Marshal at the time of the issuance of the Building Permit, never approved the plans as required by statute. Even if we applied the standard for summary judgment, Defendants' attempt to undermine the validity of the Building Permit must fail. Under Rhode Island law, a building permit is presumed valid unless there is sufficient evidence to rebut that presumption. ***See*** Caprio v. Rizzo, 1981 R.I. Super. LEXIS 61, ***citing*** Sea View Cliffs, Inc. v. Zoning Bd. of Review of the Town of North Kingstown, 309 A.2d 20, 23 (1973). As proponents of the motion, Defendants bore the burden of initially producing evidence showing that there was no dispute of fact as to whether or not the Fire Marshal had indeed approved the plans.[1] ***See*** Celotex v. Catrett, 477 U.S. 317, 323 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("Of course,

[1] Similarly, Local Rule Cv 56(a)(2) expressly commands the proponent of a motion for summary judgment to identify in its Statement of Undisputed Facts any evidence supporting the undisputed fact.

a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); Torres-Rosado v. Roger-Sabat, 335 F.3d 1, 9 (1st 2003).

Defendants have not met their initial burden of production on the point of whether or not the Fire Marshal neglected to approve Plaintiff's building plans. Not a shred of evidence has been produced. On that basis alone, the Defendants cannot be granted summary judgment on the basis of an alleged invalidity of the Building Permit. Even if the Defendants had produced some evidence in support of the allegation that the Fire Marshal had neglected to review and approve the Plaintiff's building plans, Plaintiff has some evidence to create an issue of fact on this point. Specifically, Mr. Quattrucci informed Narragansett officials on October 10, 2006, he had been obtaining verbal approvals from the Fire Marshal as a standard operating procedure for some time. Mr. Quattrucci also informed Narragansett that that procedure had been followed in this case. (Ex. 1, ¶ 36; Ex. 11, ¶ 15.) At very least, then, there is a material dispute of facts as to the validity of the Building Permit, Defendants' unsupported representations notwithstanding.

Finally, and contrary to the arguments of Defendants, the balance of the equities could not more plainly lie with the Plaintiff. Defendants suggest that balance of the equities in this matter should fall in favor of permitting the Fire Marshal to block the issuance of Certificates of Authority if he or she later decides that plan approval was granted in error – even when the applicant has long since begun its plans and taken other substantial action in reliance. Admittedly, if there had been an immediate danger to health and safety, the balance of the equities might well tip the other way. However, the Defendants have never made such an

allegation. Instead, Defendants would apparently have this Court hold that local Fire Marshals may continuously move the finish line of a project at the expense of applicants for as long as they like under any circumstances

This position taken by Defendants violates every conceivable notion of equity. Narragansett completely understands that it has a positive duty to protect the safety of its workers and the general public. At no point has Narragansett attempted to elude its responsibilities for code compliance. Indeed, from the very beginning of its attempts to locate in the City, Narragansett has taken affirmative steps to ensure that compliance. However, Narragansett's experiences serve as an example of the abuses that legitimate and responsible businesses can and will suffer if the Defendants' interpretation of the law is permitted to prevail. The potential for abuse is particularly high in situations involving construction, in that differing interpretations of the applicable code can and do exist.

Narragansett has gone above and beyond everything that is reasonable in order to satisfy Defendant Rave's demands, but has continued to experience obstruction, obfuscation, and even punitive behaviors. The simple fact of the matter is that as a matter of law, Plaintiff was titled to rely upon the issuance of a building permit and the approval of the plans submitted in that process, and was titled to a certificate of occupancy once those plans were completed. *See* Caprio, at *6. For that reason, Defendants cannot dispose of the estoppel claim at this juncture as a matter of law.

**B. <u>PLAINTIFF HAD A PROPERTY INTEREST IN ITS BUILDING PERMIT AND EXPECTATION OF RECEIVING A CERTIFICATE OF OCCUPANCY ON COMPLETION OF APPROVED CONSTRUCTION, BUT WAS DEPRIVED OF THAT INTEREST WITHOUT DUE PROCESS OF LAW.</u>**

Defendants also urge this Court to dismiss Plaintiff's § 1983 claim. Essentially, as with their estoppel claim, their argument rests on the proposition that the Fire Marshal and other City officials have done nothing more than perform their duty to protect the public in accordance with the law. This attempt to avoid responsibility for their conduct must fail. Defendant City building and fire officials are no different from any other public safety officials, in that they must respect the Plaintiff's constitutional rights. Plaintiff has a viable claim that they did not do so in this case.

**1. The Laws of the State of Rhode Island Created a Property Interest in the Plaintiff's Building Permit and the Expectation of the Issuance of Certificate of Occupancy Once the Approved Construction Was Completed.**

As a threshold matter, Plaintiff must identify the precise nature of the property interest that it seeks to vindicate through its § 1983 action. The existence of a property right is determined by consultation with state law. *See* <u>Torres-Rosado</u>, 335 F.3d at 9. Rhode Island law does recognize that a vested property interest can inhere in a building permit.

As we described in Subsection A, the laws of the State of Rhode Island clearly hold that once a building permit is issued, and substantial action is taken thereon, there is a vested right in that building permit that cannot be revoked as a matter of municipal fiat -- or backpedalling. This Court has itself had occasion to review the question of whether the interest in a valid building permit rises to the level of a property interest protectable under the Fourteenth Amendment. The answer has been consistently positive. On at least two occasions, this Court has relied upon the *Shalvey* line of cases to infer a property right in a validly issued building

permit, once substantial reliance has been taken thereon. *See* Lanmar v. Rendine, 811 F.Supp. 47, 51 (D.R.I. 1993); P.L.S. Partners, Women's Medical Center of Rhode Island, Inc. v. City of Cranston, 696 F.Supp. 788, 798 (D.R.I. 1988).

Furthermore, the property interest conferred by a building permit logically extends to the issuance of a certificate of occupancy. In other words, once that building permit has been issued and substantial action has been taken thereon, its holder also has a reasonable expectation in the issuance of a certificate of occupancy, provided that it performs the work approved. *See* Acorn Ponds at North Hills v. Incorporated Village of North Hills, 623 F.Supp. 688, 692 (E.D.N.Y. 1985). Accordingly, once the holder of the permit takes substantial action, that reasonable expectation of receiving a certificate of occupancy similarly cannot be taken away without due process of law. *See id. See also* Caprio, at 6-7. As we also described in Subsection A, the Plaintiff had long since perfected its property interest in its original building permit, and its expectation of receiving a certificate of occupancy once the approved work had been completed.

**2. The Actions of the City Officials Deprived Plaintiff of Its Property Interests in Its Building Permit in a Manner Which Violated Plaintiff's Rights to Procedural Due Process.**

Not only has Plaintiff established a property interest in its Building Permit and the expectation of a certificate of occupancy, but Plaintiff can also establish the second prong of its § 1983 claim, that is, that Defendants, under color of law, have deprived the Plaintiff of that property under the color of law, without constitutionally sufficient due process. *See* Lanmar, at 51. Plaintiff has more than adequately asserted that the Defendants have in fact deprived Plaintiff of its interest in its building permit, and the expectation of receiving a certificate of occupancy once the approved construction is completed. Furthermore, that deprivation took place without anything approaching what would be construed as adequate procedure.

A review of the statutory procedures for issuing building permits and certificates of occupancy is essential to an understanding of precisely how the Defendants wrongfully deprived the Plaintiff of its property interest in its Building Permit and expectation of receiving a certificate of occupancy once the approved construction was completed. The issuance of building permits is governed by governed by R.I.G.L. § 23-27.3-114.1, which provides in pertinent part:

> (a) The building official shall examine or cause to be examined all applications for permits and amendments thereto within fifteen (15) days after filing. Before a permit is granted for the excavation or for the erection of any building or structure, a written statement shall be furnished by the owner from a town or city engineer as to the established grades. If the application or plans do not conform to the requirements of this code or of all applicable laws, the building official shall reject the application citing the specific sections of this code or applicable law upon which the rejection is based. If the building official is satisfied that the proposed work conforms to the requirements of this code and all laws applicable thereto, he or she shall issue a permit.

R.I.G.L. § 23-27.3-113.5 does grant the Fire Marshal a role in approvals -- at the initial building permit stage. R.I.G.L. § 23-27.3-113.5 reads, in pertinent part:

> **§ 23-27.3-113.5 Plans and specifications. –** The application for the permit shall be accompanied by not less than three (3) copies of specifications and plans drawn to scale, with sufficient clarity and detail dimensions to show the nature and character of the work to be performed. The plans and specifications shall have prior approval in accordance with the Fire Safety Code, chapters 28.1 – 28.39 of this title. . . .

R.I.G.L. § 23-28.1-6 in turn requires that prior to the issuance of the building permit, the Fire Marshal must review and approve said plans:

> **§ 23-28.1-6 Applicability to new or existing structures. –** (a) All regulations contained in this code apply to all structures unless specifically exempted. Prior to a building permit being issued, all plans for buildings regulated under this code shall be submitted to the authority having jurisdiction. The authority having jurisdiction shall approve or disapprove the completed set of plans within a reasonable time not to exceed ninety (90) days. When a change of use or type of occupancy is made in an existing building, the building shall conform to the requirements established by the rehabilitation building and fire code for existing

buildings and structures, or if the rehabilitation building and fire code for existing structures is not applicable, to the requirements for new structures as related to the proposed use or type of occupancy.

Once the construction is completed, the Building Official determines whether a Certificate of Occupancy may issue. Additionally, the Building Official may issue a Temporary Certificate of Occupancy when the construction is sufficiently completed:

**23-27.3-120.2. Buildings hereafter altered.**

No building or structure subsequently enlarged, extended, or altered to change the use group classification, the fire-grading, the maximum live load capacity, or the occupancy load capacity, in whole or in part, shall be occupied or used until the certificate has been issued by the building official, certifying that the work has been completed in accordance with the provisions of this code, the rehabilitation building and fire code for existing buildings and structures, the fire safety code (chapters 28.1 -- 28.39 of this title) and the approved permits, and all of the applicable codes of all for which a permit is required. Any use or occupancy, which was not discontinued during the alterations, shall be discontinued within thirty (30) days after the completion of the alteration unless the required certificate is issued by the building official.

**23-27.3-120.3. Existing buildings.**

Upon written request from the owner of an existing building, the building official shall issue a certificate of use and occupancy, provided there are no violations of law or orders of the building official or the fire official pending, and it is established after inspection and investigation that the alleged use of the building has heretofore existed. Nothing in this code shall require the removal, alteration, or abandonment of, or prevent the continuance of the use and occupancy of, a lawfully existing building, unless the use is deemed to endanger public safety and welfare.

**23-27.3-120.6. Contents of certificate.**

The certificate shall certify compliance with the provisions of this code and the purpose for which the building or structure may be used in its several parts, and shall be issued by the building official within ten (10) days after final inspection; provided, that the provisions of the approved permits and of the applicable codes for which permits are required have been met. . . .

**23-27.3-120.5**

Upon the request of the holder of a permit, the building official may issue a temporary certificate of occupancy for a building or structure, or part thereof,

> before the entire work covered by the permit shall have been completed; provided, that the portion or portions may be occupied safely prior to full completion of the building without endangering life or public health, safety, and welfare; and, provided further, that the agencies having jurisdiction over permits issued under other applicable codes are notified of the decision to issue a temporary certificate.

It is significant to note that the Fire Marshal plays a limited role in the statutory process. Under these statutes, the local Fire Marshal does have a role in the building permitting process. That role begins and ends at the planning stage. In other words, the local Fire Marshal's approval is part and parcel of the building permit upon which the Plaintiff was constitutionally entitled to rely. *See* Caprio, at *6-7. However, the ultimate decision on the issuance of a certificate of occupancy rests with the Building Official. Although the Fire Marshal would apparently be entitled to notice in the case of a Temporary Certificate of Occupancy, it is the Building Official who determines whether the building can be occupied safely.

In the present situation, the Building Official appears to have been usurped by the present Fire Marshal, Defendant Rave. Since his appointment in August, 2006, Defendant Rave has consistently worked to deprive the Plaintiff of its interest in its building permit and the expectation of receiving a certificate of occupancy once the approved work was performed. Defendant Rave essentially revoked the valid building permit issued to Narragansett by the Building Official. Defendant Rave (in concert with Defendant Powers) unilaterally declared that permit invalid, based on his own assertion that the plans were never approved. (Ex. 1, ¶ 16-22; Ex. 18.) Later, he imposed an ever-changing set of additional conditions upon the issuance of a Certificate of Occupancy, despite the fact that the Plaintiff had perfected their property interest in the original building permit. (Ex. 9; Ex. 12.) Finally, he issued an order stopping all construction or testing of the equipment Plaintiff needed to install. (Ex. 26.) Defendant Rave was in fact acting in an *ultra vires* fashion, in that at a number of points indicated that he in fact

controlled whether or not a certificate of occupancy would issue. (Ex. 1, ¶ 25; Ex. 18 (p. 3.)) That role, however, is for the Building Official.

Furthermore, this deprivation took place without any due process whatsoever. Even in cases involving building permits and certificates of occupancy, notice and some type of hearing must be granted ***before*** the State deprives a person of their property interests, whenever feasible. ***See*** Norton v. Town of Islip, 239 F.Supp.2d 264, 272 (E.D.N.Y. 2003), ***citing*** Zinermon v. Burch, 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). This Court in fact made that specific finding in cases where the applicants had taken substantial action in reliance upon the issuance of said permit. ***See*** P.L.S. Partners, 696 F.Supp. at 798.

Defendants attempt to suggest that an adequate post-deprivation remedy was available to the Plaintiff, and that that cures the original wrongful deprivation. Even if a post-deprivation remedy were sufficient in a case of this nature, the remedies suggested by the Defendants are far from adequate The Defendant suggests to this Court that the Plaintiff had the option ". . . to file an administrative appeal of Quattrucci's decision to the East Providence Zoning Board of Review." (Defendants' Memorandum, p. 12.) This remedy was not available to the Plaintiff. The Plaintiff could not have appealed any decision of Quattrucci because Quattrucci has never made any decision in the first place; Defendant Rave assumed control over the entire process. In any case, Section 19-38(a) of the East Providence Ordinances limits the Board's appellate authority to those matters arising in ". . . the enforcement or interpretation of this chapter, or of any ordinance adopted pursuant to this chapter." The reference to "this chapter" is obviously to Chapter 19 of the Ordinances. Chapter 19, however, pertains only to zoning, not to building standards. Therefore, it appears that that Board has no authority to review Quattrucci's decisions.

Furthermore, there was no adequate relief offered by the Fire Safety Code Board of Appeal and Review. It is true that Plaintiff did receive from the Board a decision outlining a multi-step Plan approving the issuance of Temporary Certificates of Occupancy that allowed an increasing scope of operations while Plaintiff completed additional construction. However, that decision does not cure the original deprivation. For that matter, the decision does not provide complete relief. While the Board apparently wished to provide reassurance to the local building officials, the Board in fact has no authority to require the issuance of certificates of occupancy of any kind, whether temporary or otherwise. Instead, that authority rests with the Building Official. This state of affairs has in fact been acknowledged by the Board. (Ex. 40, p. 7.) In any case, the Board has no ability to make the Plaintiff whole for the substantial delays that it incurred in construction and beginning operations as a result of Defendants' actions.

### 3. Defendants Deprived Plaintiff of Its Property Interest in a Manner Which Violated Plaintiff's Substantive Due Process Rights.

The Defendants also try to negate any claim that the Plaintiff's rights to substantive due process were violated. In order to establish that a substantive due process right was violated, Plaintiff must establish that the action taken by Defendants was in and of itself ". . . egregiously unacceptable, outrageous, or conscience-shocking . . ." ***See*** Licari v. Ferruzzi, 22 F.3d 344 (1st Cir. 1994), ***citing*** Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990). In cases involving licensing and permitting, this Circuit has taken the position that generally, more than mere mistake, error in application of law, arbitrary conduct, or even bad faith conduct is necessary to substantiate a § 1983 claim for violation of substantive due process rights. ***See*** Collins v. Nuzzo, 244 F.3d 246 (1st Cir. 2001). However, this Circuit has still ". . . left the door slightly ajar for federal relief in truly horrendous situations." ***See*** Nestor Colon Medina & Sucessores, Inc. v.

Custodio, 964 F.2d 32, 45 (1st Cir. 1992). We believe that this is one of "truly horrendous" situations.

The Plaintiff's experience represents one of those instances in which governmental authority is being abused in a particularly unconscionable manner. Essentially, what the City Defendants have insisted upon throughout this process is the absolute right to continuously move the finish line on any construction project by finding alleged violations of the fire code – even when the work in question is being done in accordance with plans that were *already approved* by the appropriate City officials. Defendants have insisted on being permitted this right to move the finish line not only in the fall of 2006, but was repeated in 2007, when the Defendants refused to confirm precisely what was needed to be done in order to obtain a final certificate of occupancy. (Ex. 39.) This insistence upon being permitted to deal with private property interests in such a fashion is the definition of tyranny. The financial hardships incurred by the Plaintiff as a result of this behavior have been extreme. (Ex. 1, ¶ 50.) Accordingly, Plaintiff should be permitted to proceed on its claims of violations of substantive due process.

**4. Defendants Are Not Entitled To Qualified Immunity.**

Finally, Defendants' argument that they are entitled to qualified immunity must fail. Qualified immunity does provide some level of protection for public officials performing discretionary duties. ***See*** Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 2738. 73 L.Ed 2d. 396 (1982) Public officials may assert qualified immunity if their conduct does not violate "clearly established" statutory or constitutional rights. *See id.* On summary judgment, this Court should determine whether the law governing the situation at hand was clearly established. If not, then the defense is sustained. If the law was clearly established, then the

defense fails, unless the official can show that through some extraordinary circumstances he or she neither knew nor should have known of the relevant standard. ***See id***.

Under the circumstances, the Defendants should not be permitted to assert the qualified immunity defense. As we have described in the above subsections, it has been established in Rhode Island for some time that a property owner has a vested right in a building permit once that property owner had taken substantial action in reliance thereon. As we discussed above, that right had been treated as a property interest by this Court on at least two occasions in the past. ***See*** Lanmar, 811 F.Supp. at 51; P.L.S. Partners, 696 F.Supp. at 798. Accordingly, any reasonably competent building official knew or should have known that it tampered with Plaintiff's building permit at its own peril.

Defendants also cannot establish, on their bare representation, that the procedures followed were the "norm in these instances." As the movants, they have the initial burden of production. ***See*** Celotex, 477 U.S. at 323. They have failed to produce any evidence that the procedures were the "norm." Furthermore, even if unconstitutional procedures are the "norm," that fact does not safeguard the Defendants from liability.[2]

**C. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS OF WRONGFUL INTERFERENCE WITH ECONOMIC ADVANTAGE UNDER COUNTS IV, V, AND VI OF ITS COMPLAINT.**

The Defendants also cannot extricate themselves from the claims of wrongful interference with Narragansett's economic advantages. In order to establish a wrongful interference with economic advantage, one must establish the existence of a business relationship or expectancy, knowledge by the interferor of the relationship or expectancy; an intentional act

[2] Defendants also assert that no derivative, failure-to-supervise claim can be sustained against the City and the Chief because, in their view, no claim can be sustained against the other officials. Because the claims against the junior officials can be sustained, the argument for dropping the derivative claims must fail.

of interference; proof that the interference caused the harm sustained; and damages to the plaintiff. ***See*** L.A. Ray. Realty v. Town Council of the Town of Cumberland, 698 A.2d 202, 207 (R.I. 1997). The wrongful interference with the issuance of building approvals has been recognized as a form of wrongful interference with economic advantage. ***See id.***

As we noted above, during the pre-litigation phase of this matter, Defendant Rave, in concert with Defendant Powers, effectively revoked Plaintiff's building permit and expectation of receipt of a certificate of occupancy. First, Defendant Rave and Powers unilaterally declared the building permit to be invalid. This revocation of the building permit was ***ultra vires***, and in excess of statutory authority, as neither were authorized to revoke an approval already given in the permitting process, or change the terms and conditions upon which a building permit had been given. ***See*** Shalvey, ***supra.***

Secondly, Defendant Rave and Defendant Powers imposed a set of after-the-fact conditions on the issuance of a Certificate of Occupancy, demanding construction far over and above that which was originally included in the approved plans. (Ex. 9, Ex. 12.) Defendant Rave compounded the intrusion in this process by engaging in a course of conduct that made it virtually impossible for Narragansett to determine precisely what was being demanded of it. First Narragansett was given one deficiency list, then, a month later, was given yet another with even more conditions. (Ex. 9, Ex. 12.) Defendant Rave repeatedly took inconsistent positions at the expense of Narragansett. For example, at one point, Defendant Rave promised Mr. Carden a temporary certificate of occupancy if Mr. Carden changed the specifications for raw material. (Ex. 1, ¶ 25.) Mr. Carden did so (Ex. 1, ¶ 25; Ex. 10), only to have Defendant Rave renege. Defendant Rave reneged yet again on his agreement to work with Mr. Carden on in-house cleaning. (Ex. 1, ¶ 33.) Defendant Rave later decided that that would be too burdensome to

supervise – despite the fact that he was *also* insisting upon Narragansett's paying for a detail firefighter. (Ex. 18.)

Just before this litigation was brought, Defendant Rave further frustrated Narragansett's quest for a certificate of occupancy by attempting to refuse to allow Narragansett to communicate with him except by certified mail, and by arbitrarily refusing to allow Narragansett to make submissions of information at all – even when Narragansett was attempting to respond to his specific requests for information. (Ex. 1, ¶ 38, Ex. 11, ¶ 5-15; Ex. 21.) For Defendant Quattrucci's part, he acquiesced in Rave and Power's intrusion by not making any ruling at all, but allowing Defendant Rave to usurp Quattrucci's authority to determine whether or not a certificate of occupancy (temporary or otherwise) should issue. In fact, Defendant Quattrucci ratified Defendant Rave's conduct, when both united to forbid Narragansett even to test its equipment as part of its construction process. (Ex. 25-26.)

Even taking the most generous view of the Defendants' conduct, the history cited above supports an inference of malice. It is apparent that the ultimate goal was not a legitimate interest in public safety, but an active desire to ensure that Plaintiff would never become operational. This intention was evident when Defendant Rave insisted upon demanding that the entire premises be made a High Hazard area – even when his own handpicked experts did not agree with that assessment. This intention becomes manifest when Defendant Rave began to refuse to allow Narragansett to make submissions. In the case of Defendant Powers, his joining with Defendant Rave betrays much the same tendency, as Powers had participated in the original permitting process to begin with and had been familiarized with Narragansett's intended operations. Nevertheless, Powers appeared on the scene in August, demanding new and additional work. (Ex. 1, ¶ 8.)

This pre-litigation conduct clearly interfered with Plaintiff's interest in the economic advantage arising from its building permit and the prospect of being permitted to begin its business operations. Furthermore, as we noted above, the Defendants continued the process of obstructing Plaintiff's ability to obtain a building permit even after a decision was issued by the Board. Defendants continued to impose requirements above and beyond what was contemplated under the original decision and delay inspections. Defendant Rave managed to ensure that Plaintiff could not embark on the first phase of that Board decision, by refusing the submissions that would begin the process. (Ex. 11, ¶ 16-19.) Defendant Powers achieved a delay of several weeks by insisting on certain work being performed before a temporary certificate of occupancy was issued – despite the fact that that was not part of a decision that had been carefully negotiated for some time, again with *his* participation. (Ex. 1, ¶ 40-44; Ex. 27, p. 1.) Defendant Rave would later succeed in achieving further delays by refusing to perform necessary inspections *and* refusing to extend a temporary certificate of occupancy. (Ex. 35.)

Worse, Defendants reneged on an earlier tacit agreement to ascertain precisely what steps would need to be taken in order to attain compliance. Defendants took this step knowing that that was preventing the Plaintiff from obtaining financing to allow it to complete the steps of the plan under the Decision. For several weeks, Plaintiff's consultants had been working on this letter with Defendant Rave. (Ex. 29-32) Defendant Rave never voiced any objection to providing this letter until the very last minute, when it was critical to have that letter to finalize the financing. (Ex. 33-34, 38; Second Verified Complaint, ¶ 132 and Answer of City Defendants, ¶ 132.) As a result, Narragansett was delayed in obtaining financing, and in fact did not get the contract for the approximately $8,000,000 worth of its finished product. (Ex. 1, ¶

56.) Under these circumstances, Plaintiff can support the Count for intentional inference under Counts IV and V.

Finally, Defendants cannot obtain dismissal of the Plaintiff's count alleging tortuous interference with Plaintiff's relationship with its landlord, referenced in Count VI. The Defendants' communication to the landlord was wrongful, in that it clearly gave the impression that the conditions in the Plaintiff's leased space were creating an imminent threat to public health and safety. (Ex. 36; Ex. 12, ¶ 21-23.) As a result, Plaintiff's problems with operating its business were aggravated by the fact that its relationship with its landlord was disrupted. The landlord responded to the letter by threatening eviction. (Ex. 37.) Plaintiff therefore had to expend further business energy in resolving that situation. (Ex. 12, ¶ 21-23.)

### D. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE COUNTS FOR CIVIL CONSPIRACY PURSUANT TO COUNTS VIII, IX, AND X.

The Defendants also seek to dismiss the claims of civil conspiracy brought against Counts VIII, IX and X of Plaintiff's Second Verified Complaint. The conspiracy claims in Counts VIII and IX rest on allegations that various of the Defendants engaged in civil conspiracies to violate the provisions of the Rhode Island Code of Ethics, R.I.G.L. § 36-14-5(a). The conspiracy claim in Count X alleges the Defendants Rave, Quattrucci, Wise, and Powers engaged in a civil conspiracy to wrongfully deny the Plaintiff its interests their certificates of occupancy and/or temporary certificates of occupancy, and also to wrongfully interfere with Plaintiff's economic interests.

Defendants attempt to dispose of Counts VIII and IX by arguing that the Plaintiff had neglected to allege that the Defendants in question had any financial interest in the transactions involved, nor did they gain any monetary benefit therefrom. This argument cannot support the

dismissal of the conspiracy provisions arising under R.I.G.L. § 36-14-5(a). That statute provides, in pertinent part:

> (a) No person subject to this code of ethics shall have any interest, financial or otherwise, direct or indirect, or engage in any business, employment, transaction, or professional activity, or incur any obligation of any nature, which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, as defined in § 36- 14-7.

Under R.I.G.L. § 36-14-5(a), public officials are prohibiting from engaging in transactions in which they possess an interest, or engaging in any business or transactions that are in "substantial conflict" with the proper discharge of their duties or employment. "Substantial conflict" is defined at R.I.G.L. § 36-14-7(a)

> a) A person subject to this code of ethics has an interest which is in substantial conflict with the proper discharge of his or her duties or employment in the public interest and of his or her responsibilities as prescribed in the laws of this state, if he or she has reason to believe or expect that he or she or any person within his or her family or any business associate, or any business by which the person is employed or which the person represents will derive a direct monetary gain or suffer a direct monetary loss, as the case may be, by reason of his or her official activity.

A "substantial conflict" exists where the public official in question believes or has reason to believe that he or a business associate or family member will receive a monetary gain or loss as a result of the official activity.

As for Counts VIII, Plaintiff has alleged sufficient facts to support a claim of conspiracy. That Count alleges that Defendant Wise, who was the City Fire Marshal and State Deputy Fire Marshal, conspired with Dana Newbrook, a member of the State Fire Code Board of Appeal and Review, to make business referrals for Mr. Newbrook for Newbrook's architectural firm. Newbrook, in his capacity as member of the Board, had supervisory responsibilities over Wise, in that it has been suggested that the Board at least asserts some review authority over the decisions

of the local fire marshals. (Ex. 27.) Obtaining referrals for one's private enterprise from one's public-sector subordinates is well-recognized as a violation of R.I.G.L. § 36-14-5(a).[3] *See, e.g.,* Advisory Opinion 2006-8 (Florio), Rhode Island Ethics Commission.[4]

It is true that it is not alleged that Defendant Wise obtained any financial gain in the transaction between Newbrook and Narragansett, nor is it alleged that Defendant Wise had any expectation of such. However, Defendant Wise is not being sued for violating the statute; he is being sued for conspiring with Newbrook to effectuate Newbrook's own violation of the Code of Ethics. A conspiracy is defined in the same manner under civil law as it is under criminal law. *See* Paradis v. Landfredi, 1996 R.I. Super. LEXIS 97, *citing* 15A C.J.S. Conspiracy, § 1(2) (1967 & Supp. 1995) n6. A conspiracy is defined as the agreement of one or more parties to perform an unlawful act, or to engage in a lawful act for an unlawful purpose. *See* State v. Gilman, 291 A.2d 425, 432 (R.I. 1972). It is well-established that one can be a liable as a member of a conspiracy without being guilty of the underlying offense. *See* Salinas v. United States, 522 U.S. 52, 64, 118 S.Ct. 469, 477, 139 L.Ed.2d (1997) This is so even if one is not among the class of persons capable of committing the underlying offense. *See* United States v. Lester, 363 F.2d 68, 72 (6th Cir. 1966). It is also well-established that one can be liable as a member of a conspiracy even if one has received no personal gain by virtue of one's participation. *See* Gilman, at 432, *citing* State v. Bacon, 27 R.I. 252, 61 A. 653 (1905).

Accordingly, it is irrelevant that Wise himself could not have been directly charged with an Ethics Code violation, in that he had no expectation of monetary gain from his referrals to Newbrook. All that was necessary was that Wise and Newbrook agree that the improper referrals be made, and that Wise have done any act to further that agreement. *See* Gilman, at

---

[3] For that matter, it could also violate R.I.G.L. § 36-14-5(d), which prohibits the use of one's office for public gain.
[4] Available at http://www.ethics.ri.gov/Advisory_Opinions/2006/2006-008.htm.

218. That allegation has been more than adequately alleged in the complaint. For that reason, Count VIII must be allowed to stand. Furthermore, because Defendants' argument in favor of dismissal of Count IX against Captain Rave mirrors that for dismissal of Count VIII, Defendants similarly cannot have Count IX dismissed.

Defendants also attempt to dispose of Count X by re-asserting its earlier arguments that none of the Defendants had wrongfully interfered with the Plaintiff's business. Because these arguments are invalid, Defendants cannot rely upon them in support of their attempt to jettison the conspiracy claims against Rave, Quattrucci, Wise, and Powers. We also note that the Defendants apparently omit a great deal of the particulars of the allegations Rave, Quattrucci, Wise, and Powers. Contrary to Defendants' assertions, Plaintiff's Count X does not merely rely upon the original denial of the certificate of occupancy, or issuance of the temporary certificate of occupancy. Instead, Plaintiff relies upon the other obstructive conduct engaged in by Defendants to fulfill various plans to obtain the temporary certificates of occupancy, and, ultimately, the permanent certificate of occupancy.

**E. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM OF LENDER LIABILITY BROUGHT UNDER COUNT VII OF PLAINTIFF'S COMPLAINT.**

The Defendant City of East Providence also should not be permitted an easy escape from its liabilities as Plaintiff's lender. This claim against the City was brought in Count VII of its Second Verified Amended Complaint. Defendants do not produce any evidence in support of a motion for summary judgment for this Count. Instead, Defendants merely argue that Plaintiff's complaint does not adequately define the City's duties to the Plaintiff as a lender, or the manner in which those duties were allegedly breached.

Defendants fall far short of showing that the Plaintiff could not obtain relief under lender liability under the standard of Fed.R.Civ.P. 12(b)(6). In order to obtain dismissal under Fed.R.Civ.P. 12(b)(6), Defendants must be prepared to show that the Plaintiff could not possibly be entitled to relief under any factual circumstances. *See* Gray II, 400 F.Supp.2d 415 at 420-22. Under this relaxed standard, Plaintiff has more than adequately alleged a potential claim for lender liability. At bare minimum lender has an obligation of good faith and fair dealing that includes the duty not to purposefully injure a borrower's right to obtain the benefits of the contractual relationship with the lender. *See* In re Greenberg, 212 B.R. 422, 429 (D.Mass. 1997). Plaintiff's Second Verified Complaint defined the nature of the City's breach of that duty of good faith, that is, that the City, through the improper actions of its officials described elsewhere in the Complaint, purposefully and improperly interfered with the ability of the Plaintiff to open its business. (Complaint, ¶ 200-201.) Opening that business was precisely the benefit that the Plaintiff sought to gain by entering into the loan agreement with the City in the first place. Accordingly, the Defendants cannot claim that there is no set of factual circumstances under which Plaintiff can sustain a claim of lender liability.

## F. DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF COUNTS I AND II OF PLAINTIFF'S COMPLAINT, SEEKING DECLARATORY AND INJUNCTIVE RELIEF.

The Defendants also attempt to dispose of Plaintiff's Counts I and II of Plaintiff's Complaint, which seek declaratory and injunctive relief. Defendants largely rely upon their arguments outlined elsewhere in their memorandum in support of dismissal of the other counts. Plaintiff similarly will rely upon its own counterarguments.[5]

---

[5] Plaintiffs also wish to point out that Defendants inaccurately claim that this Court has already considered Plaintiff's request for injunctive relief and has not granted it. (Defendants' Memo, p. 27.) Plaintiff in fact passed its motion for injunctive relief after some conferencing.

## IV. CONCLUSION

For the above-referenced reasons, the Defendants' Motion for Summary Judgment should be DENIED.

Narragansett Pellet Corp.
By its attorneys,

/s/ Stephen M. Robinson
Stephen M. Robinson #2103
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
June 15, 2007

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
The Law Offices of Stephen M. Robinson
155 South Main Street, Suite 402
Providence, RI 02903
(401) 331-6565
(fax) 331-7888
June 15, 2007

## CERTIFICATION

I, the undersigned, hereby certify that on June 15, 2007 I sent a true copy of the within by electronic service to all of the parties below:

Timothy Chapman, Esq.
Office of the City Solicitor
City Hall
145 Taunton Avenue
East Providence, RI 02914

Richard Woolley, Esq.
Department of the Attorney General
150 South Main Street
Providence, RI 02903

Marc DeSisto, Esq.
2 Angell Street
P.O. Box 2563
Providence, RI 02906

/s/ Vicki J. Bejma